Lawrence J. Semenza, III, Esq., Bar No. 7174
Email: ljs@semenzalaw.com
Christopher D. Kircher, Esq., Bar No. 11176
Email: cdk@semenzalaw.com
LAWRENCE J. SEMENZA, III, P.C.
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803
Facsimile: (702) 920-8669

Michael J. Sheehan, *pro hac to be filed*
Ankoor Bagchi, *pro hac to be filed*
DLA PIPER, LLP
203 North LaSalle Street
Chicago, Illinois 60601-1293
Telephone (312) 368-7044
Facsimile (312) 251-5844

*Attorneys for Defendants Cognizant Technology*
*Solutions U.S. Corporation and John Maguire*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| COMPUTER SCIENCES CORPORATION,<br><br>Plaintiff,<br>v.<br><br>COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, JOHN MAGUIRE, and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO.<br><br>Second Judicial District Court of Nevada, Washoe County Case No. CV-15-00856 |

### PETITION OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1332 AND 1441

**TO:   THE CLERK OF THE ABOVE-ENTITLED COURT:**

Defendants Cognizant Technology Solutions U.S. Corporation and John Maguire (together, "Defendants"), by and through undersigned counsel, remove the above-referenced action for all further proceedings to the United States District Court for the District of Nevada

LAWRENCE J. SEMENZA, III, P.C.
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

1

from the Second Judicial District Court, Washoe County, Nevada. As grounds for removal, Defendants state as follows:

## BACKGROUND

1. Plaintiff Computer Sciences Corporation ("Plaintiff") filed an action in the Second Judicial District Court, Washoe County, Nevada on May 6, 2015 entitled *Computer Sciences Corporation v. Cognizant Technology Solutions U.S. Corporation, John Maguire, and DOES 1-10, inclusive*, Case No. CV-15-00856.

2. Defendants were served with process in this action on May 8, 2015; copies, as served, are attached as Exhibit A. No other process, pleadings, orders, or other documents have been received or filed in this action.

3. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 (**diversity**). This case is, accordingly, properly removed under 28 U.S.C. § 1441.

## DIVERSITY JURISDICTION

4. Here, **diversity** jurisdiction is proper under 28 U.S.C. § 1332(a) in that there is complete diversity of citizenship:

(a) There is complete diversity of citizenship. Plaintiff is a corporation organized and existing under the laws of the State of **Nevada**, with its principal place of business located at 3170 Fairview Park Drive, Falls Church, **Virginia** 22042. (Complaint ¶ 1.)

(b) Defendant Cognizant Technology Solutions U.S. Corporation is a **Delaware** corporation which maintains its principal place of business in College Station, **Texas**. (Complaint ¶ 2.)

(c) Defendant John Maguire is a citizen of the State of **Connecticut**. (Complaint ¶ 3.)

LAWRENCE J. SEMENZA, III, P.C.
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

LAWRENCE J. SEMENZA, III, P.C.
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

(d)   The citizenship of fictitious "Doe" defendants is disregarded for the purposes of removal. 28 U.S.C. § 1441(b)(1) ("In determining whether a civil action is removable on the basis of the jurisdiction under section 1332(a) of this title, the citizenship of defendants sued under fictitious names shall be disregarded.").

(e)   Thus, under 28 U.S.C. § 1332(a) and (c), each Defendant is diverse from Plaintiff.

5.   Likewise, **diversity** jurisdiction is proper under 28 U.S.C. § 1332(a) in that the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs:

(a)   Plaintiff demands in its prayer for relief: "return of the value of gains realized by [Defendant] Maguire on exercised [Computer Sciences Corporation] stock options (currently valued at or around $627,600.00)." (Complaint, Prayer for Relief ¶ 2.)

(b)   Plaintiff alleges that, with respect to the claims made against Defendant Maguire, "Defendants, and/or others acting in concert with them, acted together to commit the tortious and otherwise unlawful acts discussed herein while acting in concert or pursuant to a common design to harm" Plaintiff. (Complaint ¶ 59.)

(c)   Because the Complaint expressly seeks an amount greater than $75,000 and alleges that Defendants acted in concert, not severally, the amount in controversy is met. *See Winner's Circle of Las Vegas, Inc. v. AMI Franchising, Inc.*, 916 F. Supp. 1024, 1028 (D. Nev. 1996) (finding that claims against multiple defendants allegedly acting in concert were common and undivided, therefore could be aggregated to meet the amount in controversy requirement for federal subject matter jurisdiction) (*citing Libby, McNeill, & Libby v. City Nat'l Bank*, 592 F.2d 504, 510 (9th Cir. 1978). ("The tests for aggregating claims of one plaintiff against multiple defendants and of multiple plaintiffs against one defendant are essentially the same

3

. . .: the plaintiff's claims against the defendants must be common and undivided so that the defendants' liability is joint and not several.").

## **DEFENDANTS HAVE COMPLIED WITH ALL PREREQUISITES FOR REMOVAL**

6.     This notice of removal is timely under 28 U.S.C. § 1446(b).  Defendants removed this case within 30 days after being served with Plaintiff's Summons and Complaint, and less than one year after the date on which the state court action was filed.

7.     Written notice of this Notice of Removal has been mailed contemporaneously to Plaintiff through their attorneys of record.   In addition, this Notice of Removal is being contemporaneously filed with the Clerk of the Second Judicial District Court, Washoe County, Nevada, pursuant to 28 U.S.C. § 1446(d).

WHEREFORE, Defendants give notice that this action is removed from the Second Judicial District Court, Washoe County, Nevada, to the United States District Court for the District of Nevada.

LAWRENCE J. SEMENZA, III, P.C.
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

## <u>CERTIFICATION</u>

It is hereby certified that the undersigned has read the foregoing pleading. To the best of counsel's knowledge, information and belief, formed after reasonable inquiry, the same is well grounded in fact and is warranted by existing law, and it not interposed for any improper purpose such as to harass or cause unnecessary delay or needless increase in the cost of litigation, all in accordance with Federal Rule of Civil Procedure 11.

DATED this 20th day of May, 2015.

LAWRENCE J. SEMENZA, III, P.C.

/s/ Lawrence J. Semenza, III
Lawrence J. Semenza, III, Bar No. 7174
Christopher D. Kircher, Bar No. 11176
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145

AND

DLA PIPER, LLP

Michael J. Sheehan, *pro hac to be filed*
Ankoor Bagchi, *pro hac to be filed*
203 North LaSalle Street
Chicago, Illinois 60601-1293
Telephone (312) 368-7044
Facsimile (312) 251-5844

*Attorneys for Defendants Cognizant Technology
Solutions U.S. Corporation and John Maguire*

LAWRENCE J. SEMENZA, III, P.C.
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

LAWRENCE J. SEMENZA, III, P.C.
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

## CERTIFICATE OF SERVICE

I am employed by the law firm of LAWRENCE J. SEMENZA, III, P.C. in Clark County. I am over the age of 18 and not a party to this action. My business address 10161 Park Run Dr., Ste. 150, Las Vegas, Nevada 89145.

On the 20th day of May, 2015, I served the document(s), described as:

**PETITION OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1332 AND 1441**

☒ by placing the ☐ original ☒ a true copy thereof enclosed in a sealed envelope addressed

☐ a. **ECF System** *(You must attach the "Notice of Electronic Filing", or list all persons and addresses and attach additional paper if necessary)*

☒ b. **BY U.S. MAIL.** I deposited such envelope in the mail at Las Vegas, Nevada. The envelope(s) were mailed with postage thereon fully prepaid. I am readily familiar with LAWRENCE J. SEMENZA, III, P.C.'s practice of collection and processing correspondence for mailing. Under that practice, documents are deposited with the U.S. Postal Service on the same day which is stated in the proof of service, with postage fully prepaid at Las Vegas, Nevada in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date stated in this proof of service.

Ann Morgan
Shannon S. Pierce
FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501

Attorneys for Plaintiff

☐ c. **BY PERSONAL SERVICE.**

☒ d. **BY DIRECT EMAIL.**

FENNEMORE CRAIG, P.C.
Ann Morgan - amorgan@fclaw.com

☐ e. **BY FACSIMILE TRANSMISSION.**
**I declare under penalty of perjury that the foregoing is true and correct.**

/s/ Olivia A. Rodriguez_____
An Employee of LAWRENCE J. SEMENZA, III, P.C.

# EXHIBIT A

# EXHIBIT A

$1425
Ann Morgan
Nevada Bar No. 933
Shannon S. Pierce
Nevada Bar No. 12471
FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Telephone: (775) 788-2200
Facsimile: (775) 786-1177
e-mail: amorgan@fclaw.com

Attorney for Plaintiff
Computer Sciences Corporation

FILED

2015 MAY -6 PM 4:25

JACQUELINE BRYANT
CLERK OF THE COURT
BY___P. Sowell
DEPUTY

**IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

**IN AND FOR THE COUNTY OF WASHOE**

| | |
|---|---|
| COMPUTER SCIENCES CORPORATION, | CASE NO.  CV15 00856 |
| Plaintiff, | DEPT. NO.  3 |
| v. | **COMPLAINT**<br>**INCLUDES JURY DEMAND** |
| COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, JOHN MAGUIRE, and DOES 1-10, inclusive, | |
| Defendants. | |

COMES NOW, Plaintiff Computer Sciences Corporation ("CSC"), by and through its counsel Fennemore Craig, P.C., and for its claims against Defendants Cognizant Technology Solutions U.S. Corporation ("Cognizant"), John Maguire ("Maguire"), and DOES 1-10, inclusive (who along with Maguire and Cognizant, are collectively referred to herein as "Defendants"), and each of them, avers and alleges as follows:

## I.  PARTIES

1.     Plaintiff CSC is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business located at 3170 Fairview Park Drive, Falls Church, Virginia 22042.

2.     Defendant Cognizant is a Delaware corporation which, on information and belief, maintains its principal place of business in College Station, Texas.

1

FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Tel: (775) 788-2200    Fax: (775) 786-1177

FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Tel: (775) 788-2200    Fax: (775) 786-1177

3.     Defendant Maguire is an individual who, on information and belief, resides at 305 Main Street, Ridgefield, Connecticut 06877.

4.     Plaintiff does not know the true names and capacities of DOES 1-X, inclusive. Plaintiff is informed and believes and thereon alleges that each fictitiously named Defendant is in breach of a contract or is tortuously or otherwise legally responsible in some manner for the occurrences alleged in this Complaint and for Plaintiff's damages, and that each said Defendant proximately caused damages to Plaintiff as alleged herein.

5.     Plaintiff prays leave, when the true names and capacities of DOES 1-10 are ascertained, that it may be permitted to insert the same herein with appropriate allegations; but upon information and believe, Plaintiff alleges that each said Defendant is legally responsible for the events and happenings referred to herein and proximately caused damages to Plaintiff as alleged herein.

6.     Plaintiff is informed and believes, and thereon alleges, that each Defendant, including DOES 1-10 if not specifically alleged otherwise herein, is the agent, servant, employee, affiliate, representative, principal, master, supervisor, and/or employer of each other Defendant; at all times alleged herein, each Defendant, including DOES 1-10, if not specifically alleged otherwise herein, was acting with the course and scope of such agency, affiliation, employment or other relationship.   Relief is sought against each and all Defendants, as well as its or their agents, assistants, successors, employees, affiliates, and all persons or entities acting in concert or cooperation with them or at their direction.

## II.  JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over Defendant Cognizant because Cognizant is qualified to do business in the State of Nevada and maintains a registered agent for service of process in the State of Nevada.

8.     This Court has personal jurisdiction over Defendant Maguire because Maguire has consented to personal jurisdiction in the State of Nevada pursuant to certain written agreements that form the basis, in part, of this lawsuit.

2

FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Tel: (775) 788-2200  Fax: (775) 786-1177

9.     Venue is proper in this Court because Defendant Maguire has consented to jurisdiction and venue in the state courts for the County of Washoe, State of Nevada.

## III.   FACTS COMMON TO ALL CAUSES OF ACTION

### A.     Background Concerning Plaintiff CSC

10.     CSC is a global provider of information technology ("IT") and professional services and solutions to corporate customers.  Since it was founded in 1959, CSC has helped its clients develop and integrate their IT assets in support of operational efficiency, new growth initiatives and other business objectives.  CSC's clients include commercial enterprises and the U.S. federal government, as well as state, local and non-U.S. government agencies. CSC has approximately 70,000 employees serving 2,500 clients in more than 70 different countries.

### B.     CSC'S Employment of Maguire

11.     In April 2013, CSC hired Maguire as its Vice President Global Sales.  In connection with his employment as an officer and high-ranking employee of CSC, Maguire received compensation including an annual salary of $625,000.00, $625,000.00 in eligible annual bonuses, and participation in CSC's incentive stock option program.

12.     As the Vice President of Global Sales of CSC, Maguire was responsible for all sales activities of CSC on a global basis and enjoyed regular access to CSC's confidential and proprietary information, including information concerning virtually all of CSC's customers and prospective customers, CSC's products, costs, pricing, sales process and methodologies, global sales strategies, and the identities, skills, and aptitudes of CSC employees who were and are critical to CSC's global sales and sales support efforts.

### C.     Maguire's Original Non-Solicitation Agreement And Stock Option Award Agreements

13.     As a part of his employment with CSC, Maguire signed a Non-Competition/Non-Solicitation Agreement with CSC, dated April 19, 2013 ("Non-Solicitation Agreement").  This Non-Solicitation Agreement prohibited Maguire from (a) disclosing or misusing CSC's confidential and proprietary information, (b) soliciting CSC's employees or customers for a defined period of time,

3

FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Tel: (775) 788-2200 Fax: (775) 786-1177

1   and/or (c) competing against CSC for a defined period of time. A true and correct copy of the Non-

2   Solicitation Agreement is attached hereto as **Exhibit 1**, and is incorporated herein by reference.

3         14.     In entering into the Non-Solicitation Agreement, Maguire acknowledged that he "has

4   carefully read and considered the [above-referenced restrictions] and agrees that [such restrictions]

5   are fair and reasonable, are supported by valid consideration, and are reasonably required to protect

6   legitimate business interests of CSC."

7         15.     Separate and apart from the Non-Solicitation Agreement, and in connection with his

8   participation in CSC's incentive stock option program, Maguire entered into five (5) separate stock

9   option award agreements with CSC (collectively the "Stock Option Award Agreements"). True and

10  correct copies of the Stock Option Award Agreements are attached hereto as **Exhibits 2-6**, and are

11  incorporated herein by reference.

12        16.     Each of the Stock Option Award Agreements contained a recoupment and forfeiture

13  provision, through which Maguire is required to return to CSC the value of gains realized on

14  exercised options, and to forfeit unexercised options, in the event that Maguire (i) misuses or

15  disclosed CSC's confidential information; (ii) solicits CSC employees or clients; or (iii) competes

16  against CSC in violation of his contractual obligations.

17        17.     The Non-Solicitation Agreement and the Stock Option Award Agreements are each

18  expressly governed by Nevada law. Through the Non-Solicitation Agreement, Maguire

19  acknowledged that if he breached or threatened to breach his non-disclosure, non-solicitation, and/or

20  non-competition obligations, CSC would suffer immediate and irreparable harm such that CSC

21  would be entitled to (and Maguire specifically stipulated to entry of) injunctive relief prohibiting

22  Maguire from further breaching such obligations. Through the Stock Option Award Agreements,

23  Maguire further consented to personal jurisdiction and venue in this Court.

24     **D.**    **After Maguire Departs From CSC, CSC Agrees To Narrow The Non-**

25          **Solicitation And Non-Competition Provisions Governing Maguire**

26        18.     Effective October 24, 2014, Maguire left the employ of CSC. Thereafter, on or about

27  November 13, 2014, Maguire and CSC entered into a letter agreement ("Letter Agreement")

28  through which CSC agreed to narrow the non-solicitation and non-competition provisions contained

4

in the Non-Solicitation Agreement -- provisions that Maguire had previously acknowledged were already reasonably tailored and necessary to protect CSC's legitimate business interests. A true and correct copy of the Letter Agreement, redacted to shield confidential information, is attached hereto as **Exhibit 7** and incorporated herein by reference.

19.     Specifically, through the Letter Agreement, CSC and Maguire agreed that:

a.     For a period of six (6) months following Maguire's separation from CSC, Maguire would not directly or indirectly associate with certain listed entities, including Cognizant, without the written permission of CSC;

b.     For a period of twelve (12) months, Maguire would not hire, attempt to hire, or "assist[] any other person or entity in hiring or attempting to hire any current employee of CSC or any person who was a CSC employee within the 6-month period preceding such hiring or attempted hiring";

c.     For a period of twelve (12) months, Maguire would not solicit or assist in the solicitation of certain named CSC clients; and

d.     Maguire's obligations to protect and not misuse or disclose CSC's confidential information would remain in effect as stated in the Non-Solicitation Agreement.

20.     Two months later, in January 2015, Maguire approached CSC seeking yet another modification to the Non-Solicitation Agreement. This time, Maguire sought CSC's consent for him to accept employment with Cognizant – one of the CSC direct competitors with whom Maguire was expressly prohibited from accepting employment under the terms of the Letter Agreement.

21.     In a letter agreement dated January 19, 2015 (the "Second Letter Agreement"), CSC gave its consent for Maguire to accept employment with Cognizant effective February 9, 2015. In the Second Letter Agreement, Maguire affirmed that the original Letter Agreement (from November 2014) would otherwise "continue in full force and effect on the terms and conditions stated therein." A true and correct copy of the Second Letter Agreement, redacted to shield confidential information, is attached hereto as **Exhibit 8** and incorporated herein by reference.

22.     Maguire then joined Cognizant as its Senior Vice President of Sales. In this position, Maguire is responsible for Cognizant's overall sales effort, and in that regard, works in a directly

5

competitive position to the position he held at CSC. Cognizant (and now Maguire) compete for the same customers, and same business, as CSC. Maguire's innate and detailed knowledge of CSC's confidential and proprietary information – including information concerning CSC's customers and prospective customers, CSC's products, costs, pricing, sales process and methodologies, global sales strategies, and the identities, skills, and aptitudes of CSC employees who were and are critical to CSC's global sales and sales support efforts – is of immeasurable competitive value and will cause irreparable harm to CSC if used by Maguire in connection with his role as the head of sales for Cognizant.

**E.     Maguire Recruits CSC Employee Eddie Woods To Join Cognizant**

23.     On or about April 6, 2009, Eddie Woods ("Woods") joined CSC as a Business Development Executive. Woods rose through the ranks at CSC, ultimately achieving the title of Director Offering Sales Applications. Prior to his departure, Maguire headed the sales organization in which Woods worked and formed a close working relationship with Woods.

24.     As Director Offering Sales Applications for CSC, Woods was a high-ranking member of CSC's sales organization and enjoyed regular access to CSC's confidential and proprietary information, including information concerning CSC's products, services, pricing and sales strategies.

25.     On April 18, 2015, shortly after Maguire commenced his employment with Cognizant, Woods resigned from CSC and joined Cognizant as a member of its Strategic Engagement Team. Woods resigned from CSC only days after CSC incurred significant costs to repatriate Woods to the United States.

26.     In his role at Cognizant, Woods is again working for Maguire. On information and belief, Maguire solicited or participated in the solicitation of Woods by Cognizant, including through the use of CSC's confidential and proprietary information.

**F.     Defendants' Unlawful Use of CSC's Confidential and Proprietary Information**

27.     In addition to Maguire's unlawful use of CSC confidential and proprietary information to recruit Woods, upon information and belief, Cognizant and Maguire have and are continuing to use and disclose CSC confidential and proprietary information, in violation of the

FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Tel: (775) 788-2200  Fax: (775) 786-1177

6

Non-Solicitation Agreement, Stock Option Award Agreements, and applicable law. CSC will suffer immediate and irreparable harm unless Defendants are not restrained and enjoined from: (i) all further unauthorized use of CSC's confidential and proprietary information; and (ii) all further attempts to improperly solicit CSC's employees and/or customers.

<div align="center">

**FIRST CLAIM FOR RELIEF**

**(Breach of Contract – Against Maguire)**

</div>

28.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 27 of this Complaint as though set forth fully herein.

29.     The Non-Solicitation Agreement, Stock Option Award Agreements, and Letter Agreement are each valid, binding, and enforceable contracts between CSC and Defendant Maguire.

30.     CSC performed all of its obligations under the Non-Solicitation Agreement, Stock Option Award Agreements, and Letter Agreement or was excused from such performance.

31.     On information and belief, Maguire has materially breached the Non-Solicitation Agreement, Stock Option Award Agreements, and Letter Agreement by soliciting, and aiding Cognizant in the solicitation of, Woods and potentially other CSC employees.

32.     On information and belief, Maguire has also materially breached the Non-Solicitation Agreement, Stock Option Award Agreements, and Letter Agreement by disclosing and using CSC's confidential and proprietary information to and for the benefit of Cognizant.

33.     Maguire has further breached the Stock Option Award Agreements through his failure and refusal to return – after he solicited CSC employees and misused CSC confidential information – gains that he realized on the exercise of CSC options.

34.     As a direct and proximate result of the breaches of the Non-Solicitation Agreement, Stock Option Award Agreements, and Letter Agreement, CSC has suffered, and will continue to suffer, immediate and irreparable injury, for which CSC has no adequate remedy at law, and for which CSC is entitled to preliminary and permanent injunctive relief.

35.     Also as a direct and proximate result of Maguire's breaches of the Non-Solicitation Agreement, Stock Option Award Agreements, and Letter Agreement, CSC has suffered damages, in excess of the minimum jurisdictional limits of this Court, and in an amount to be proven at trial.

FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Tel: (775) 788-2200   Fax: (775) 786-1177

FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Tel: (775) 788-2200   Fax: (775) 786-1177

## SECOND CLAIM FOR RELIEF

### (Tortious Interference With Contract – Against Cognizant)

36.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 35 of this Complaint as though set forth fully herein.

37.     The Non-Solicitation Agreement, Stock Option Award Agreements, and Letter Agreement constitute valid and enforceable contracts.

38.     On information and belief, Cognizant had knowledge of those contracts and willfully and intentionally acted to disrupt the contractual relationship between CSC and Maguire.

39.     Cognizant's actions resulted in actual disruption of the contractual relationship between CSC and Maguire.

40.     Cognizant's acts of interference were not justified or taken in the exercise of any legitimate interests of Cognizant.

41.     As a direct and proximate result of Cognizant's interference with Maguire's contractual obligations, CSC has suffered, and will continue to suffer, immediate and irreparable injury, for which CSC has no adequate remedy at law, and for which CSC is entitled to preliminary and permanent injunctive relief.

42.     As a direct and proximate cause of Cognizant's interference with Maguire's contractual obligations, CSC has suffered damages in excess of the minimum jurisdictional limits of this Court, including damages from the use and disclosure of its confidential and proprietary information, as well as employees and clients improperly solicited by Maguire.  CSC is entitled to recover such from Cognizant.

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – Against Maguire)

43.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 42 of this Complaint as though set forth fully herein.

44.     As an officer and high-ranking employee of CSC, Defendant Maguire owed to CSC a fiduciary duty of utmost loyalty, candor, and good faith.

8

FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Tel: (775) 788-2200  Fax: (775) 786-1177

45.   Upon information and belief, Defendant Maguire breached his fiduciary duties to CSC by taking or retaining CSC confidential and proprietary information with him upon leaving CSC's employment, whether in physical form or otherwise, and using that information to benefit a CSC competitor – Cognizant.

46.   Upon information and belief, Defendant Maguire breached his fiduciary duties to CSC by soliciting other CSC employees to leave their employment with CSC to join Cognizant.

47.   As a direct and proximate result of Maguire's breaches of fiduciary duty, CSC has suffered, and will continue to suffer, immediate and irreparable injury, for which CSC has no adequate remedy at law, and for which CSC is entitled to preliminary and permanent injunctive relief.

48.   As a direct and proximate cause of the breaches of fiduciary duty by Defendant Maguire, CSC has suffered damages in excess of the minimum jurisdictional limits of this Court and in an amount to be proven at trial.

49.   The breaches of fiduciary duty by Defendant Maguire were committed knowingly and intentionally.  As a result, CSC is entitled to recover exemplary and punitive damages from Defendant Maguire in an amount to be determined by the jury.

## FOURTH CLAIM FOR RELIEF

### (Aiding and Abetting Breach of Fiduciary Duty – Against Cognizant)

50.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 49 of this Complaint as though set forth fully herein.

51.   As an officer and high-ranking employee of CSC, Defendant Maguire owed to CSC a fiduciary duty of utmost loyalty, candor, and good faith.

52.   Defendant Cognizant knew of the fiduciary duties owed by Maguire to CSC.

53.   Maguire breached his fiduciary duties to CSC as described above.

54.   On information and belief, Defendant Cognizant knowingly and substantially participated in or encouraged Maguire's breach of his fiduciary duties to CSC.

55.   As a direct and proximate result of Cognizant aiding and abetting Maguire to breach his fiduciary duties, CSC has suffered, and will continue to suffer, immediate and irreparable injury,

9

1  for which CSC has no adequate remedy at law, and for which CSC is entitled to preliminary and
2  permanent injunctive relief.

3       56.    As a direct and proximate cause of Cognizant aiding and abetting Maguire to breach
4  his fiduciary duties, CSC has suffered damages in excess of the minimum jurisdictional limits of
5  this Court and in an amount to be proven at trial.

6       57.    Cognizant's actions, in aiding and abetting Maguire to breach his fiduciary duties,
7  were committed knowingly and intentionally. As a result, CSC is entitled to recover exemplary and
8  punitive damages from Defendant Cognizant in an amount to be determined by the jury.

9  **FIFTH CLAIM FOR RELIEF**

10  **(Concert of Action – Against Cognizant and Maguire)**

11       58.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 57 of
12  this Complaint as though set forth fully herein.

13       59.    On information and belief, Defendants, and/or others acting in concert with them,
14  acted together to commit the tortious and otherwise unlawful acts discussed herein while acting in
15  concert or pursuant to a common design to harm CSC.

16       60.    As a direct and proximate result of Defendants' concert of action, CSC has suffered,
17  and will continue to suffer, immediate and irreparable injury, for which CSC has no adequate
18  remedy at law, and for which CSC is entitled to preliminary and permanent injunctive relief.

19       61.    As a direct and proximate cause of Defendants' concert of action, CSC has suffered
20  damages in excess of the minimum jurisdictional limits of this Court and in an amount to be proven
21  at trial.

22       62.    Defendants' actions, in forming, agreeing to, and carrying out their concert of action,
23  were committed knowingly and intentionally. As a result, CSC is entitled to recover exemplary and
24  punitive damages from Defendants in an amount to be determined by the jury.

25  //
26  //
27  //
28  //

FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Tel: (775) 788-2200   Fax: (775) 786-1177

# VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter a judgment in favor of Plaintiff, and against Defendants, awarding Plaintiff:

1.      Preliminary and permanent injunctive relief as follows:

(a)      Requiring Defendants, and all others acting in concert with them, to return all of CSC's confidential and proprietary information to the undersigned counsel for CSC in forensically sound fashion, preserving all pertinent metadata;

(b)      Enjoining Defendants, and all others acting in concert with them, from using, copying, uploading, downloading, transmitting, transferring, or disclosing any confidential or proprietary information of CSC;

(c)      Enjoining Defendants, and all others acting in concert with them, from directly or indirectly soliciting CSC employees; and

(d)      Enjoining Defendant Maguire from working in any capacity for Cognizant that would lead to actual or threatened disclosure or use of CSC's confidential or proprietary information for a reasonable period of time, but no less than one year.

2.      The return of the value of gains realized by Maguire on exercised CSC stock options (currently valued at or around $627,600.00).

3.      Refund of the any and all consideration paid to Maguire under the Letter Agreement.

4.      Plaintiff's actual damages established at trial, plus any incidental or consequential damages, and disgorgement of any amounts earned by them as a result of their use of CSC's confidential and proprietary information.

5.      Exemplary and punitive damages in an amount to be determined by the jury.

6.      Pre-judgment and post-judgment interest at the highest lawful rate of interest.

7.      All costs of Court incurred herein.

8.      Such other and further relief, general or special, at law or in equity, to which Plaintiff may be justly entitled.

# V.  JURY DEMAND

Plaintiff CSC hereby demands a trial by jury on all issues so triable.

The undersigned does hereby affirm that the preceding document does not contain the social security number of any person.

DATED this ⎣0th⎦ day of May, 2015.

FENNEMORE CRAIG, P.C.

_Shannon Pierce_

Ann Morgan
Nevada Bar No. 933
Shannon S. Pierce
Nevada Bar No. 12471
300 East Second Street, Suite 1510
Reno, NV 89501

Attorneys for Plaintiff
Computer Sciences Corporation

# INDEX OF EXHIBITS

| Exhibit No. | Description | Number of Pages |
|---|---|---|
| 1 | Non-Solicitation Agreement | 4 |
| 2 | Stock Option Award Agreement | 14 |
| 3 | Stock Option Award Agreement | 17 |
| 4 | Stock Option Award Agreement | 14 |
| 5 | Stock Option Award Agreement | 12 |
| 6 | Stock Option Award Agreement | 18 |
| 7 | Letter Agreement | 6 |
| 8 | Second Letter Agreement | 1 |

FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, NV 89501
Tel: (775) 788-2200  Fax: (775) 786-1177

# EXHIBIT 1

# EXHIBIT 1



### *I -- Introduction/Consideration*

This Non-Competition/Non-Solicitation Agreement (the "Agreement") is between John Maguire ("Employee") and Computer Sciences Corporation, including its direct and indirect subsidiaries and affiliated entities, successors and assigns (collectively "CSC"). Employee acknowledges that CSC is in a competitive industry in which the creation, maintenance and use of confidential or proprietary information are critical to business success, and that the protection of that information is a legitimate business interest of CSC. Employee also acknowledges that this Agreement is reasonably necessary to protect the good will and other legitimate business interests of CSC.

The collective consideration for Employee's obligations under this Agreement, each of which Employee specifically acknowledges is independently sufficient consideration, includes: Employee's continued eligibility to participate in one or more of CSC's various equity incentive plans; Employee's access to and receipt of Confidential Information relating to CSC's business and clients; Employee's opportunity to receive special training and education; Employee's employment with CSC; and Employee's compensation and other benefits.

### *II -- Definitions*

"Client" means any client with respect to whom Employee provided services, on behalf of whom Employee transacted business, or with respect to whom Employee possessed Confidential Information during the 12-month period preceding the termination of Employee's employment with CSC for any reason.

"Competitor" means an individual, business or any other entity or enterprise engaged or having publicly announced its intent to engage in business that is substantially similar to CSC's business. For purposes of this Agreement, the parties specifically agree that: CSC is engaged in the business of providing technology-enabled solutions and services; that CSC's capabilities include, but are not limited to, system design and integration, information technology and business process outsourcing, applications software development, Web and application hosting, mission support and management consulting; and that CSC actively solicits business and services clients located throughout the United States and the world. A *non-exhaustive* list of CSC's Competitors includes Accenture, Xerox/ACS, HP/EDS, General Dynamics, IBM, L-3 Communications, Lockheed Martin, Northrop Grumman, Dell/Perot Systems, SAIC, Oracle/Sun Microsystems, Unisys Corporation, Infosys, WiPro, Tata, Cognizant, or any subsidiary or affiliate thereof.

"Confidential Information" means all CSC trade secrets, patents, copyrights, confidential or proprietary business information and data, sales and financial data, pricing information, manufacturing and distribution methods, information relating to CSC's business plans and strategies including, but not limited to, customers and/or prospects, or lists thereof, marketing plans and procedures, research and development plans, methods of doing business, both technical and non-technical, information relating to the design, architecture, flowcharts, source or object code and documentation of any and all computer software products which CSC has developed, acquired or licensed or is in the process of developing, acquiring or licensing or shall develop, acquire or license in the future, hardware and database technologies or technological information, formulae, designs, process and systems information, intellectual property rights, and any other confidential or proprietary information which relates to the business of CSC or to the business of any client or vendor of CSC or any other party with whom CSC agrees to hold information in confidence, whether patentable, copyrightable or protectable as trade secrets or not. Confidential Information does not include information which is (i) already known by Employee without an obligation of confidentiality, (ii) publicly known or becomes publicly known through no unauthorized act of Employee, (iii) rightfully received from a third party without an



obligation of confidentiality, (iv) disclosed without similar restrictions by CSC to a third party (other than an affiliate or customer of CSC), or (v) approved by CSC, in writing, for disclosure.

"Prospective Client" means any individual or enterprise who is not a Client but with whom CSC was in active business discussions or negotiations at any time during the 12-month period preceding the termination of Employee's employment with CSC for any reason and whose identity became known to Employee in connection with Employee's relationship with or employment by CSC .

---

### III – Covenants/Related Provisions

1. **Non-Disclosure and Non-Use of Confidential Information:** CSC shall provide Employee Confidential Information relating to CSC, its business and clients. Employee agrees not to disclose, use, copy or duplicate or otherwise permit the use, disclosure, copying or duplication of any Confidential Information (other than in connection with authorized activities conducted in the course of Employee's employment at CSC for the benefit of CSC) during or following his/her employment with CSC. Employee agrees to take all reasonable steps and precautions to prevent any unauthorized disclosure, use, copying or duplication of Confidential Information.

2. **Non-Solicitation of CSC Employees, Clients, and Prospective Clients:** During the time of Employee's employment and for a period of 24 months thereafter, Employee shall not, without the express, prior written consent of CSC's General Counsel, engage in any of the conduct described in Subparagraphs (a) and (b) below, either directly or indirectly, individually or as an employee, agent, contractor, consultant, member, partner, officer, director or stockholder (other than as a stockholder of less than 5% of the equities of a publicly held corporation) or in any other capacity for any person, firm, partnership or corporation:

   a. hire, attempt to hire or assist any other person or entity in hiring or attempting to hire any current employee of CSC or any person who was a CSC employee within the 6-month period preceding such hiring or attempted hiring;

   b. solicit, divert or cause a reduction in the business or patronage of any Client or Prospective Client.

3. **Non-Competition:** During the time of Employee's employment and for a period of 12 months thereafter, Employee shall not, without the express, prior written consent of CSC's General Counsel, either directly or indirectly, as an employee, agent, contractor, consultant, partner, member, officer, director or stockholder (other than as a stockholder of less than 5% of the equities of a publicly traded corporation), wherever CSC is marketing or providing its services or products, participate in any activity as, or for, a Competitor of CSC which is the same or similar to the activities in which Employee was involved at CSC.

**REASONABLENESS OF RESTRICTIONS: EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ AND CONSIDERED THE PROVISIONS OF PARAGRAPHS III(1), (2) AND (3) OF THIS AGREEMENT AND AGREES THAT THE RESTRICTIONS SET FORTH HEREIN ARE FAIR AND REASONABLE, ARE SUPPORTED BY VALID CONSIDERATION, AND ARE REASONABLY REQUIRED TO PROTECT LEGITIMATE BUSINESS INTERESTS OF CSC. EMPLOYEE FURTHER AGREES THAT IF EMPLOYEE VIOLATES THE PROVISIONS OF PARAGRAPHS III(1), (2) OR (3) OF THIS AGREEMENT THAT THE NUMBER OF DAYS THAT EMPLOYEE IS IN VIOLATION WILL BE ADDED TO ANY PERIODS OF LIMITATION ON THE ACTIVITIES SPECIFIED HEREIN.**



4. **Injunctive Relief/Remedies:** Employee acknowledges and agrees that if Employee were to breach, or threaten to breach, any provision of this Agreement, CSC would suffer immediate and irreparable harm and would therefore be entitled to specific performance through injunctive relief ordered by a court of appropriate jurisdiction, without the need to post any bond. Employee therefore consents and stipulates to the entry of such injunctive relief in an appropriate court prohibiting Employee from breaching this Agreement. This Paragraph III(4) shall not, however, diminish the right of CSC to claim and recover money damages in addition to injunctive relief.

5. **Reformation, Severability, and Survival:** If the scope of any provision contained in this Paragraph III is too broad to permit enforcement of such provision to its full extent, then CSC and Employee agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law, and enforce this Agreement as reformed or modified. Subject to the provisions of the foregoing sentence, whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision, to the extent of such prohibition or invalidity, shall be deemed not to be a part of this Agreement, and shall not invalidate the remainder of such provision or the remaining provisions of this Agreement. Employee specifically agrees that Paragraph III(1) (Non-Disclosure and Non-Use of Confidential Information), Paragraph III(2) (Non-Solicitation of CSC Employees, Clients, and Prospective Clients) and Paragraph III(3) (Non-Competition) and each of their provisions, subparagraphs and subparts, are independent of and severable from each other, and may be enforced independently.

6. **Assignment:** The rights and obligations of CSC under this Agreement may, without the consent of Employee, be assigned by CSC, in its sole discretion, to any subsidiary, venture or affiliate of CSC or successor in interest to a substantial portion of the business or assets of CSC. Employee shall not have the right to assign Employee's rights or obligations under this Agreement.

7. **Waiver of Breach:** Any failure or delay on the part of either party to exercise any remedy or right under this Agreement shall not operate as a waiver. The failure of either party to require performance of any of the terms, covenants, or provisions of this Agreement by the other party shall not constitute a waiver of any of the rights under the Agreement. No forbearance by either party to exercise any rights or privileges under this Agreement shall be construed as a waiver, but all rights and privileges shall continue in effect as if no forbearance had occurred. No covenant or condition of this Agreement may be waived except by the written consent of the waiving party.

8. **Binding Effect:** Employee agrees that this Agreement shall be binding upon Employee's heirs, executors, and other legal representatives or assigns.

9. **Amendment:** This Agreement may not be modified or amended except by a written instrument executed by Employee and CSC's General Counsel.

10. **Entire Agreement:** This Agreement constitutes Employee's and CSC's entire agreement and supersedes all other prior agreements, understandings or representations by or between the parties, whether oral or written, with respect to the specific subject matters herein. Specifically, should Employee and CSC be parties to another agreement with provisions regarding confidentiality, non-disclosure, non-competition, non-solicitation of clients, prospective clients or employees, and all related definitions thereof, or any other restrictive



covenants included in this Agreement, such similar provisions of any other such agreement are superseded by the terms of this Agreement. *However,* this Agreement does not supersede the provisions of an equity award agreement between Employee and CSC that address Recoupment and Forfeiture.

11. **Governing Law:** This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to its conflict of law rules.

Employee:

_John Maguire_
Signature

**John Maguire**
Printed Name

4/19/13
Date

FOR CSC:

By: _M. Louise Turilli_

_M. Louise Turilli_
CSC Authorized Signature

Corporate Office | 3170 Fairview Park Drive | Falls Church, Virginia 22042
t+ 1.703.876.1000 | f+ 1.703.645.2170 | www.csc.com

J.Maguire

# EXHIBIT 2

# EXHIBIT 2

# COMPUTER SCIENCES CORPORATION

## 2004 INCENTIVE PLAN

## STOCK OPTION

## AWARD AGREEMENT

1.     **Grant of Award.**

This Agreement ("Agreement") is made and entered into as of **May 20, 2013** (the "Grant Date") by and between Computer Sciences Corporation, a Nevada corporation (the "Company"), and **John Maguire**, a full-time employee of the Company and/or one or more of its subsidiaries (the "Employee").

This Agreement granting the Employee an award under the Plan (the "Award") shall be subject to all of the terms and conditions set forth in the Computer Sciences Corporation 2004 Incentive Plan (the "Plan") and this Agreement. Except as defined in Appendix A, capitalized terms shall have the same meanings ascribed to them under the Plan.

This Award is subject to the data privacy provisions set forth in Appendix B.

The Company hereby grants to the Employee, and the Employee hereby accepts, an option to purchase **42,166** shares of Common Stock (the "Option Shares") at an exercise price of **$$44.65** per share (the "Exercise Price"), which option shall expire at 5:00 p.m., California, U.S.A. time, on **May 20, 2023** (the "Expiration Date") (the "Option"). The Option shall not initially be exercisable to purchase any Option Shares; provided, however, that upon each of the dates indicated below, the Option shall become exercisable to purchase ("vest with respect to") the number of the Option Shares indicated below across from such date:

| Number of Option Shares Vesting | Date |
|---|---|
| 14,056 | May 20, 2014 |
| 14,055 | May 20, 2015 |
| 14,055 | May 20, 2016 |

2.     **Termination of Employment; Acceleration and Termination of Options.**

(a)     <u>Termination of Status as an Employee</u>.

(i)     <u>Termination at Age 62 or Older Other than due to Cause, Death or Disability</u>.

(A)    If the Employee's status as an employee of the Company or any of its subsidiaries is terminated at age 62 or older for no reason, or for any reason other than Cause, death or Disability, then:

(1)    if the Employee shall have been (or for any other purpose shall have been treated as if he or she had been) a continuous employee of the Company or its subsidiaries for at least 10 years immediately prior to the date of termination of employment status (the "Employment Termination Date"), then (a) the portion of the Option that has not vested on or prior to such date shall fully vest immediately prior to such date, and (b) subject to Section 2(b) hereof, the Option shall terminate upon the earlier of the Expiration Date or the third anniversary of the Employment Termination Date; and

(2)    if the Employee shall not have been (and shall not for any other purpose have been treated as if he or she had been) a continuous employee of the Company or its subsidiaries for at least 10 years immediately prior to the Employment Termination Date, then, subject to Sections 2(a)(ii) and 2(b) hereof (a) the portion of the Option that has not vested on or prior to such date shall terminate on such date, and (b) the remaining vested portion of the Option shall terminate upon the earlier of the Expiration Date or the third anniversary of the Employment Termination Date.

(ii)    <u>Leave of Absence</u>.  If, prior to the exercise of the Option in full, the Employee takes a leave of absence (including a military leave of absence), the Employee and the Company each reasonably anticipate that the Employee will return to active employment and either (x) the leave of absence is to be for not more than six months or (y) at all times during the leave of absence the Employee has a statutory or contractual right to return to work, then:

(A)    while on leave of absence the Employee shall be treated as if he were an active employee;

(B)    if the Employee's leave of absence is terminated and the Employee does not return to active employment, the date of the end of the leave of absence shall be treated as the date on which the Employee has a termination of employment; and

(C)    if the Employee's leave of absence is terminated and the Employee returns to active employment, he shall be treated as if active employment had continued uninterrupted during the leave of absence.

(iii)    <u>Death or Disability</u>.  If the Employee's status as an employee of the Company or any of its subsidiaries is terminated by reason of the death or

Disability of the Employee, then (1) the portion of the Option that has not vested on or prior to the Employment Termination Date shall fully vest on such date and (2) the Option shall terminate upon the earlier of the Expiration Date or the fifth anniversary of the Employment Termination Date.

(iv)    <u>Other Termination at Age 61 or Younger</u>. If the Employee's status as an employee of the Company or any of its subsidiaries is terminated at age 61 or younger for no reason, or for any reason other than Cause, death, Disability, permanent or temporary lay off, or approved leave of absence, then (1) the portion of the Option that has not vested on or prior to the Employment Termination Date shall terminate on such date and (2) the remaining vested portion of the Option shall terminate upon the earlier of the Expiration Date or three months after the Employment Termination Date.

(b)    <u>Death Following Termination of Employment</u>. Notwithstanding anything to the contrary in this Agreement, if the Employee shall die at any time after the termination of his or her status as an employee of the Company or any of its subsidiaries and at a time when the Option is vested and exercisable, then the Option shall remain exercisable until, and shall terminate upon, the earlier of the Expiration Date or the fifth anniversary of the date of such death.

(c)    <u>Termination for Cause</u>. If the Employee's status as an employee of the Company or any of its subsidiaries is terminated for Cause, then both the vested and unvested portion of the Option shall terminate on such date.

(d)    <u>Acceleration of Option</u>.

(i)    The Committee, in its sole discretion, may accelerate the exercisability of the Option at any time and for any reason.

(ii)    Notwithstanding anything to the contrary in this Agreement, upon a Change in Control: (1) the portion of the Option then outstanding that has not vested on or prior thereto shall fully vest and (2) the Option shall remain exercisable until, and shall terminate upon, the earlier of the Expiration Date or, if applicable, the fifth anniversary of the date of the Employee's death.

(e)    <u>Certain Events Causing Termination of Option</u>. Notwithstanding anything to the contrary in this Agreement, the Option shall terminate upon the consummation of any of the following events, or, if later, the thirtieth day following the first date upon which such event shall have been approved by both the Board of Directors and the stockholders of the Company, or upon such later date as shall be determined by the Committee:

(i)    the dissolution or liquidation of the Company;

(ii)    a sale of substantially all of the property and assets of the Company, unless the terms of such sale shall provide otherwise; or

(iii)    a reorganization, merger or consolidation of the Company that results in the outstanding securities of any class then subject to the Option being exchanged for or converted into cash, property and/or securities not issued by the Company, unless the terms of such reorganization, merger or consolidation provide otherwise.

3.    **Payment of Taxes.**

(a)    If the Company and/or the Employer are obligated to withhold an amount on account of any federal, state or local tax imposed as a result of the exercise of the Option (collectively, "Taxes"), including, without limitation, any federal, state or other income tax, or any F.I.C.A., state disability insurance tax or other employment tax, then, concurrently with such exercise, the Employee shall pay to the Company, by check, the minimum aggregate amount that the Company and the Employer are so obligated to withhold, as such amount shall be determined by the Company (the "Minimum Withholding Liability"); provided, however, that the Employee may instead, on or before the exercise of the Option, irrevocably elect to pay all or any part of the Minimum Withholding Liability by either of the following methods:

(i)    pursuant to the Company's cashless exercise program; or

(ii)    by instructing the Company to withhold shares of Common Stock otherwise issuable upon such exercise of the Option (such withholding to be valued on the basis of the aggregate Fair Market Value of the withheld shares on the date of such exercise); and

provided that the Company is not then prohibited from purchasing or acquiring such shares of Common Stock, and provided, further, however, that if all of such payment is made by check and/or pursuant to the Company's cashless exercise program, then the Employee shall be entitled, but not obligated, so to pay an amount that is greater than the Minimum Withholding Liability.

(b)    The Employee acknowledges that neither the Company nor the Employer has made any representation or given any advice to the Employee with respect to Taxes.

4.    **Recoupment and Forfeiture.**

(a)    <u>Refund of Option Gains; Termination of Options</u>.    If the Employee breaches any of the covenants set forth in Section 4(b)(i), (ii) or (iii) hereof during the Applicable Restrictive Period for such exercise, then:

(i)    <u>Refund of Option Gains</u>.    If the Employee has exercised the Option within the one year period prior to the occurrence of the Employee's breach of any of the covenants set forth in Section 4(b)(i), (ii) or (iii) hereof, the Employee shall immediately deliver to the Company with respect to such exercise, an amount in cash equal to:

(A)    the aggregate Fair Market Value, determined as of the Option Exercise Date, of the shares of Common Stock issued upon such exercise; minus

(B)    the aggregate exercise price paid, whether in cash or by the delivery or withholding of shares of Common Stock, upon such exercise.

(ii)    Termination of All Options.  All outstanding Options shall be terminated and forfeited.

(b)    Triggering Events.  The events referred to in Section 4(a) hereof are as follows:

(i)    Non-Disclosure and Non-Use of Confidential Information.  The Employee agrees not to disclose, use, copy or duplicate or otherwise permit the use, disclosure, copying or duplication of any Confidential Information (other than in connection with authorized activities conducted in the course of the Employee's employment at the Company for the benefit of the Company) during the period of including during his/her employment with the Company or at any time thereafter. The Employee agrees to take all reasonable steps and precautions to prevent any unauthorized disclosure, use, copying or duplication of Confidential Information.

(ii)    Non-Solicitation of the Company's Employees, Clients, and Prospective Clients.  During the time of the Employee's employment and for a period of 24 months thereafter, the Employee shall not, without the express, prior written consent of the Company's General Counsel, engage in any of the conduct described in paragraphs (A) and (B) below, either directly or indirectly, individually or as an employee, agent, contractor, consultant, member, partner, officer, director or stockholder (other than as a stockholder of less than 5% of the equities of a publicly held corporation) or in any other capacity for any person, firm, partnership or corporation:

(A)    hire, attempt to hire or assist any other person or entity in hiring or attempting to hire any current employee of the Company or any person who was a Company employee within the 6-month period preceding such hiring or attempted hiring;

(B)    solicit, divert or cause a reduction in the business or patronage of any Client or Prospective Client.

(iii)    Non-Competition. During the time of the Employee's employment and for a period of 12 months thereafter, the Employee shall not, without the express, prior written consent of the Company's General Counsel, either directly or indirectly, as an employee, agent, contractor, consultant, partner, member, officer, director or stockholder (other than as a stockholder of less than 5% of the

equities of a publicly traded corporation), wherever the Company is marketing or providing its services or products, participate in any activity as, or for, a Competitor of the Company which is the same or similar to the activities in which the Employee was involved at the Company.

(c) <u>Waiver of Recoupment</u>. Notwithstanding the foregoing, the Employee shall be released from (i) all of his or her obligations under Section 4(a) hereof in the event that a Change in Control occurs within three years prior to the Employment Termination Date, and (ii) some or all of his or her obligations under Section 4(a) hereof in the event that the Committee (if the Employee is an executive officer of the Company) or the Company's Chief Executive Officer (if the Employee is not an executive officer of the Company) shall determine, in their respective sole discretion, that such release is in the best interests of the Company.

(d) <u>Effect on Other Rights and Remedies</u>. The rights of the Company set forth in this Section 4 shall not limit or restrict in any manner any rights or remedies which the Company or any of its affiliates may have under law or under any separate employment, confidentiality or other agreement with the Employee or otherwise with respect to the events described in Section 4(b) hereof.

(e) <u>Reasonableness</u>. The Employee agrees that the terms and conditions set forth in Section 4 hereof are fair and reasonable and are reasonably required for the protection of the interests of the Company. If, however, in any judicial proceeding any provision of Section 4 hereof is found to be so broad as to be unenforceable, the Employee and the Company agree that such provision shall be interpreted to be only so broad as to be enforceable.

(f) <u>Clawback</u>. As an additional condition of receiving this Award, the Employee agrees and acknowledges that the Award shall be subject to repayment to the Company in whole or in part in the event of a financial restatement or in such other circumstances as may be required by applicable law or as may be provided in any clawback policy that is adopted by the Company.

5. **Adjustments**. In the event that the outstanding securities of the class then subject to the Option are increased, decreased or exchanged for or converted into cash, property and/or a different number or kind of securities, or cash, property and/or securities are distributed in respect of such outstanding securities, in either case as a result of a reorganization, merger, consolidation, recapitalization, reclassification, dividend (other than a regular, quarterly cash dividend) or other distribution, stock split, reverse stock split or the like, or in the event that substantially all of the property and assets of the Company are sold, then, unless such event shall cause the Option to terminate pursuant to Section 2(e) hereof, the Committee shall make appropriate and proportionate adjustments in the number and type of shares or other securities or cash or other property that may thereafter be acquired upon the exercise of the Option; provided, however, that any such adjustments in the Option shall be made without changing the aggregate Exercise Price of the then unexercised portion of the Option.

6. **Exercise**. The Option shall be exercisable during the Employee's lifetime only by the Employee or by his or her guardian or legal representative, and after the Employee's

death only by the person or entity entitled to do so under the Employee's last will and testament or applicable intestate law. The Option may only be exercised by the delivery to the Company of a written notice of such exercise, in the form specified by the Company, which notice shall, among other things, specify the number of Option Shares to be purchased and the aggregate Exercise Price for such shares, together with payment in full of such aggregate Exercise Price by check or pursuant to the Company's cashless exercise program; provided, however, that payment of such aggregate Exercise Price may instead be made, in whole or in part, by the delivery to the Company of shares of Common Stock (including Option Shares otherwise issuable upon such exercise), which delivery effectively transfers to the Company good and valid title to such shares, free and clear of any pledge, commitment, lien, claim or other encumbrance (such shares to be valued on the basis of the aggregate Fair Market Value thereof on the date of such exercise), provided that the Company is not then prohibited from purchasing or acquiring such shares of Common Stock.

7.    **Notices.**

Unless the Company notifies the Employee in writing of a different procedure, any notice or other communication to the Company with respect to this Award shall be in writing and shall be:

(a)    by registered or certified United States mail, postage prepaid, to Computer Sciences Corporation, Attn: Corporate Secretary, 3170 Fairview Park Drive, Falls Church, VA 22042; or

(b)    by hand delivery or otherwise to Computer Sciences Corporation, Attn: Corporate Secretary, 3170 Fairview Park Drive, Falls Church, VA 22042.

Any notices provided for in this Agreement or in the Plan shall be given in writing and shall be deemed effectively delivered or given upon receipt or, in the case of notices delivered by the Company to the Employee, five days after deposit in the United States mail, postage prepaid, addressed to the Employee at the address specified at the end of this Agreement or at such other address as the Employee hereafter designates by written notice to the Company.

8.    **Stock Exchange Requirements; Applicable Laws.**    Notwithstanding anything to the contrary in this Agreement, no Option Shares purchased upon exercise of the Option, and no certificate representing all or any part of such shares, shall be issued or delivered if, in the opinion of counsel to the Company, such issuance or delivery would cause the Company to be in violation of, or to incur liability under, any securities law, or any rule, regulation or procedure of any U.S. national securities exchange upon which any securities of the Company are listed, or any listing agreement with any such securities exchange, or any other requirement of law or of any administrative or regulatory body having jurisdiction over the Company.

9.    **Nontransferability.**    Neither the Option nor any interest therein may be sold, assigned, conveyed, gifted, pledged, hypothecated or otherwise transferred in any manner other than by will or the laws of descent and distribution.

10.     **Plan.**  The Option is granted pursuant to the Plan, as in effect on the Grant Date, and is subject to all the terms and conditions of the Plan, as the same may be amended from time to time; provided, however, that no such amendment shall deprive the Employee, without his or her consent, of the Option or of any of the Employee's rights under this Agreement.  The interpretation and construction by the Committee of the Plan, this Agreement, the Option and such rules and regulations as may be adopted by the Committee for the purpose of administering the Plan shall be final and binding upon the Employee.  Until the Option shall expire, terminate or be exercised in full, the Company shall, upon written request therefor, send a copy of the Plan, in its then-current form, to the Employee or any other person or entity then entitled to exercise the Option.

11.     **Stockholder Rights.**  No person or entity shall be entitled to vote, receive dividends or be deemed for any purpose the holder of any Option Shares until the Option shall have been duly exercised to purchase such Option Shares in accordance with the provisions of this Agreement.

12.     **Nature of Company Option Grants.**  The Employee acknowledges and agrees that:

(a)     the Plan was established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, as provided in the Plan;

(b)     the grant of the Option is voluntary and occasional and does not create any contractual or other right to receive any future Option grants, or any benefits in lieu of Options, even if the Employee has repeatedly received Option grants in the past;

(c)     all decisions with respect to future grants of Options by the Company will be at the sole discretion of the Company;

(d)     the Employee's participation in the Plan shall not create a right to further employment with the Employer and shall not interfere with the ability of the Employer to terminate the Employee's employment relationship at any time with or without Cause;

(e)     the Employee is voluntarily participating in the Plan;

(f)     in the event that the Employee is not an employee of the Company, the Option grant will not be interpreted to form an employment contract or relationship with the Company; and furthermore, the Option grant will not be interpreted to form an employment contract with the Employer or any Subsidiary of the Company;

(g)     the future value of the underlying Option Shares is unknown and cannot be predicted with certainty;

(h)     if the underlying Option Shares do not increase in value, the Option will have no value; and

(i)    if the Employee exercises the Option, the value of the Option Shares acquired upon exercise may increase or decrease in value, even below the Exercise Price;

13.    **Successors.**  The Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, on the one hand, and the Employee and his or her heirs, beneficiaries, legatees and personal representatives, on the other hand.

14.    **Entire Agreement; Amendments and Waivers.**  The Agreement embodies the entire understanding and agreement of the parties with respect to the subject matter hereof, and no promise, condition, representation or warranty, express or implied, not stated or incorporated by reference herein, shall bind either party hereto.  None of the terms and conditions of the Agreement may be amended, modified, waived or canceled except by a writing, signed by the parties hereto specifying such amendment, modification, waiver or cancellation.  A waiver by either party at any time of compliance with any of the terms and conditions of the Agreement shall not be considered a modification, cancellation or consent to a future waiver of such terms and conditions or of any preceding or succeeding breach thereof, unless expressly so stated.

15.    **Governing Law; Consent to Jurisdiction.**  The Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Nevada, United States of America, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of the Agreement to the substantive law of another jurisdiction.  Any action, suit or proceeding to enforce the terms and provisions of the Agreement, or to resolve any dispute or controversy arising under or in any way relating to the Agreement, may be brought in the state courts for the County of Washoe, State of Nevada, United States of America, and the parties hereto hereby consent to the jurisdiction of such courts.

16.    **Language.**  If the Employee has received the Agreement or any other document related to the Plan translated into a language other than English, and the translated version is different than the English version, the English version will control.

17.    **Electronic Delivery.**  The Company may, in its sole discretion, decide to deliver any documents related to the Option granted under and participation in the Plan or future Options that may be granted under the Plan by electronic means or to request the Employee's consent to participate in the Plan by electronic means.  The Employee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

18.    **Severability.**  Any provision of the Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of the Agreement invalid, illegal or unenforceable in any other jurisdiction.

IN WITNESS WHEREOF, the parties hereto have caused this Award Agreement to be duly executed as of the Grant Date.

EMPLOYEE

_____
John Maguire

The Employee acknowledges receipt of the Plan and a Prospectus relating to this award, and further acknowledges that he or she has reviewed this Agreement and the related documents and accepts the provisions thereof.

_____
John Maguire
305 MAIN STREET
RIDGEFIELD CT 06877
USA

COMPUTER SCIENCES CORPORATION

By: _____
William L. Deckelman, Jr.
Executive Vice President and
General Counsel

**Appendix A**

1.    **Definitions.**

For purposes of this Agreement:

(a)    "**Applicable Restrictive Period**" shall mean, with respect to each exercise of an Option, the period set forth in Section 4(b)(i), (ii) or (iii) hereof, respectively.

(b)    "**Cause**" shall mean: (A) fraud, misappropriation, embezzlement or other act of material misconduct against the Company or any of its affiliates; (B) conviction of a felony involving a crime of moral turpitude; (C) willful and knowing violation of any rules or regulations of any governmental or regulatory body material to the business of the Company; or (D) substantial and willful failure to render services in accordance with the terms of his or her employment (other than as a result of illness, accident or other physical or mental incapacity), provided that (X) a demand for performance of services has been delivered to the Employee in writing by the Employee's supervisor at least 60 days prior to termination identifying the manner in which such supervisor believes that the Employee has failed to perform and (Y) the Employee has thereafter failed to remedy such failure to perform.

(c)    "**Change in Control**" means the consummation of a "change in ownership" of the Company, a "change in effective control" of the Company or a "change in the ownership of a substantial portion of the assets" of the Company, and in each case, as defined under Code Section 409A.

(d)    "**Client**" means any client with respect to whom the Employee provided services, on behalf of whom the Employee transacted business, or with respect to whom the Employee possessed Confidential Information during the 12-month period preceding each of (i) the date the Employee engages in an act described in Section 4(b)(ii)(B) and (ii) the date of the termination of the Employee's employment with the Company for any reason.

(e)    "**Common Stock**" means the Common Stock, par value $1.00 per share, of the Company.

(f)    "**Competitor**" means an individual, business or any other entity or enterprise engaged or having publicly announced its intent to engage in business that is substantially similar to the Company's business. For purposes of this Agreement, the parties specifically agree that: the Company is engaged in the business of providing technology-enabled solutions and services; that the Company's capabilities include, but are not limited to, system design and integration, information technology and business process outsourcing, applications software development, Web and application hosting, mission support and management consulting; and that the Company actively solicits business and services clients located throughout the United States and the world. A non-exhaustive list of the Company's Competitors includes Accenture, Xerox/ACS, HP/EDS, General Dynamics, IBM, L-3 Communications, Lockheed Martin, Northrop Grumman, Dell/Perot Systems, SAIC, Oracle/Sun

Microsystems, Unisys Corporation, Infosys, WiPro, Tata, Cognizant, or any subsidiary or affiliate thereof.

(g) **"Confidential Information"** means all Company trade secrets, patents, copyrights, confidential or proprietary business information and data, sales and financial data, pricing information, manufacturing and distribution methods, information relating to the Company's business plans and strategies including, but not limited to, customers and/or prospects, or lists thereof, marketing plans and procedures, research and development plans, methods of doing business, both technical and non-technical, information relating to the design, architecture, flowcharts, source or object code and documentation of any and all computer software products which the Company has developed, acquired or licensed or is in the process of developing, acquiring or licensing or shall develop, acquire or license in the future, hardware and database technologies or technological information, formulae, designs, process and systems information, intellectual property rights, and any other confidential or proprietary information which relates to the business of the Company or to the business of any client or vendor of the Company or any other party with whom the Company agrees to hold information in confidence, whether patentable, copyrightable or protectable as trade secrets or not. Confidential Information does not include information which is (i) already known by the Employee without an obligation of confidentiality, (ii) publicly known or becomes publicly known through no unauthorized act of the Employee, (iii) rightfully received from a third party without an obligation of confidentiality, (iv) disclosed without similar restrictions by the Company to a third party (other than an affiliate or customer of the Company), or (v) approved by the Company, in writing, for disclosure.

(h) **"Disability"** means, unless otherwise provided in an Award Agreement, a disability that entitles the Employee to benefits under the Company's long-term disability plan, as may be in effect from time to time, as determined by the plan administrator of the long-term disability plan, or if the Employee is not a participant under the Company's long-term disability plan, as determined if the Employee were a participant in a long-term disability plan that covers similarly situated employees. Notwithstanding the foregoing, if an Award is subject to Code Section 409A and Disability is a payment event, the definition of Disability shall conform to the requirements of Treasury Regulation § 1.409A-3(i)(4)(i).

(i) **"Employer"** shall mean the Employee's employer.

(j) **"Option Exercise Date"** shall mean, with respect to each exercise of an Option, the date upon which such Option is exercised.

(k) **"Prospective Client"** means any individual or enterprise who is not a Client but with whom the Company was in active business discussions or negotiations at any time during either (i) the date the Employee engages in an act described in Section 4(b)(ii)(B) or (ii) the 12-month period preceding the termination of the Employee's employment with the Company for any reason and in each case whose identity became known to the Employee in connection with the Employee's relationship with or employment by the Company.

**Appendix B**

1.     **Data Privacy.**

(a)     In order to implement, administer, manage and account for the Employee's participation in the Plan, the Company and/or the Employer may:

(i)     collect and use certain personal data regarding the Employee, including, without limitation, the Employee's name, home address and telephone number, work address and telephone number, work e-mail address, date of birth, social insurance or other identification number, term of employment, employment status, salary, nationality and tax residence, and any details regarding the terms and conditions, grant, vesting, exercise, cancellation, termination and expiration of all stock options and other stock based incentives granted, awarded or sold to the Employee by the Company (collectively, the "Data");

(ii)     transfer the Data to any third parties who may be involved in the implementation, administration and/or management of the Plan, which recipients may be located in the Employee's country or in other countries that may have different data privacy laws and protections than the Employee's country;

(iii)     transfer the Data to a broker or other third party with whom the Employee has elected to deposit any Option Shares acquired upon exercise of the Option; and

(iv)     retain the Data for only as long as may be necessary in order to implement, administer, manage and account for the Employee's participation in the Plan.

(b)     The Employee hereby explicitly and unambiguously consents to the collection, use, transfer and retention of the Data, as described in this Agreement, in electronic or other form, for the exclusive purpose of implementing, administering, managing and accounting for the Employee's participation in the Plan.

(c)     The Employee understands that by contacting his or her local human resources representative, the Employee may:

(i)     view the Data;

(ii)     correct any inaccurate information included within the Data;

(iii)     request additional information regarding the storage and processing of the Data; and

(iv)     request a list with the names and addresses of any potential recipients of the Data.

(d)     The Employee understands that he or she may refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. The Employee understands, however, that refusing or withdrawing his or her consent may affect his or her ability to participate in the Plan. For more information on the consequences of the Employee's refusal to consent or withdrawal of consent, the Employee understands that he or she may contact his or her local human resources representative.

# EXHIBIT 3

# EXHIBIT 3

# COMPUTER SCIENCES CORPORATION

## 2011 OMNIBUS INCENTIVE PLAN

## PERFORMANCE BASED RESTRICTED STOCK UNIT

## AWARD AGREEMENT

1.     **Grant of Award.**

This Agreement ("Agreement") is made and entered into as of **May 20, 2013** (the "Grant Date") by and between Computer Sciences Corporation, a Nevada corporation (the "Company"), and **John Maguire**, a full-time employee of the Company and/or one or more of its subsidiaries (the "Employee").

This Agreement granting the Employee an award under the Plan (the "Award") shall be subject to all of the terms and conditions set forth in the Computer Sciences Corporation 2011 Omnibus Incentive Plan (the "Plan") and this Agreement. Except as defined in Appendix A, capitalized terms shall have the same meanings ascribed to them under the Plan.

This Award is subject to the data privacy provisions set forth in Appendix B.

Award Granted: **17,748** Restricted Stock Units (the "Target Units")

2.     **Normal Settlement of RSUs.**

(a)     The total number of RSU Shares delivered in settlement of this Award shall be between 0% and 200%, inclusive, of the number of Target Units and, except as otherwise provided in this Agreement, shall be determined by the Committee pursuant to Appendix C to this Agreement based on the Company's performance for FY2016 ("Fiscal Year 3"). Dividend Equivalents will be paid with respect to such RSU Shares delivered in settlement at the same time as the Restricted Stock Units ("RSUs") are settled.

(b)     For purposes of this Section 2, this Award shall be settled on the Scheduled Settlement Date. The total number of RSU Shares delivered in settlement of the Award pursuant to this Section 2 shall be reduced by the number of RSU Shares, if any, delivered in settlement of the Award pursuant to Section 3 below. That is, to the extent a portion of the Award has vested and been settled pursuant to Section 3 below, that portion shall not again be settled under the provisions of this Section 2.

3.     **Prorated Settlement of RSUs.**

(a)     The RSUs shall vest and be settled as to 25% of the Target Units if the Committee determines that the Company's performance for FY2014 ("Fiscal Year 1") is at or above the threshold level of performance specified in Appendix C to this Agreement.

(b)     If the Company's performance for Fiscal Year 1 is such that no portion of the RSUs vest and are settled under Section 3(a), then the RSUs shall vest and be settled as to 25% of the Target Units if the Committee determines that the Company's performance for FY2015 ("Fiscal Year 2") is at or above the threshold level of performance specified in Appendix C to this Agreement.

(c)     If the Company's performance for Fiscal Year 1 is such that a portion of the RSUs vest and are settled under Section 3(a), then the RSUs shall vest and be settled as to an additional 25% of the Target Units if the Committee determines that the Company's performance for Fiscal Year 2 is at or above the level of performance that results in a 75% payout pursuant to Appendix C to this Agreement.  For the avoidance of doubt, up to 50% of the Target Units may vest and be settled under the provisions of this Section 3.

(d)     RSUs that vest pursuant to the provisions of this Section 3 shall be settled as soon as practicable after the date upon which the Company files with the U.S. Securities and Exchange Commission the Company's Annual Report on Form 10-K for the applicable fiscal year and calculates the performance results for the applicable performance period pursuant to Appendix C, but in no event later than March 15 of the calendar year following the calendar year in which the applicable fiscal year ends.  Dividend Equivalents will be paid with respect to such RSU Shares delivered in settlement at the same time as the RSUs are settled.

4.      **Effect of Termination of Employment; Approved Termination; Change in Control; Recoupment and Forfeiture.**

(a)     Age 62 or Older Other than for Cause, death or Disability with at least 10 Years of Service; Approved Termination.  If, prior to the Scheduled Settlement Date:

(i)     the Employee's status as an employee of the Company or any of its subsidiaries is terminated after the end of Fiscal Year 1 and during Fiscal Year 2 or Fiscal Year 3 at age 62 or older for no reason, or for any reason other than Cause, death or Disability, and the Employee shall have been (or for any other purpose shall have been treated as if he or she had been) a continuous employee of the Company or its subsidiaries for at least 10 years immediately prior to the date of termination of employment status; or

(ii)     the Employee's status as an employee of the Company or any of its subsidiaries is terminated at any time during the term of the Award and such termination is specifically approved by the Committee for purposes of this Section 4(a),

then the Company shall settle a fraction of the unvested portion of the RSU that otherwise would settle in accordance with Section 2, Section 3 (if applicable), and Appendix C of this Agreement on the applicable Settlement Date.  This fraction will be determined by calculating the number of full months of continuous service with the Company or its subsidiaries that the Employee has completed since the Grant Date and then dividing this number by 36.

(b)     Death or Disability.

(i)     If, on or before the end of Fiscal Year 3, the Employee's status as an employee of the Company or any of its subsidiaries is terminated by reason of the death or Disability of the Employee, then, one calendar month after the Employee's status as an employee of the Company or its subsidiaries is terminated (the "Employment Termination Date") the Company shall settle the unvested portion of the RSUs in full by delivering a pro-rated amount of the Target Units in accordance with Section 2, with such pro-ration based on the Employee's period of service during the applicable performance period.

(ii)     If, after the end of Fiscal Year 3 and prior to the Scheduled Settlement Date, the Employee's status as an employee of the Company or any of its subsidiaries is terminated by reason of the death or Disability of the Employee, then the Company shall settle the unvested portion of the RSUs in accordance with Section 2 and Appendix C of this Agreement, without pro-ration, as soon as practicable after the Employment Termination Date, but in no event later than the Scheduled Settlement Date.

(iii)     If settlement is by reason of termination due to death, settlement shall be to the beneficiary designated by the Employee for such purpose.

(c)     Cancellation of RSU upon Other Termination of Employment. If, prior to the last day of Fiscal Year 3, the Employee's status as an employee of the Company or any of its subsidiaries is voluntarily or involuntarily terminated other than pursuant to Section 4(a) or (b) hereof, then any unvested portion of the RSU and all related Dividend Equivalents shall automatically be cancelled as of the close of business on the Employment Termination Date.

(d)     Change in Control.

(i)     Upon a Change in Control that occurs on or before the end of Fiscal Year 3, the Company shall settle the unvested portion of the RSUs in full, without pro-ration, by delivering the Target Units within 10 days after the Change in Control.

(ii)     Upon a Change in Control that occurs after the end of Fiscal Year 3 and prior to the Scheduled Settlement Date, the Company shall settle the unvested portion of the RSUs in accordance with Section 2 and Appendix C of this Agreement, without pro ration, as soon as practicable after the Change in Control, but in no event later than the Scheduled Settlement Date.

(e)     Recoupment and Forfeiture. Settlement of all or a portion of the Award pursuant to this Section 4 is subject to the forfeiture provisions of this Section 4. Settlement of all or a portion of the Award is subject to recoupment by the Company pursuant to Section 6.

3

## 5. Withholding and Taxes.

(a)  If the Company and/or the Employer are obligated to withhold an amount on account of any federal, state or local tax imposed as a result of the grant or settlement of the RSU pursuant to this Agreement (collectively, "Taxes"), including, without limitation, any federal, state or other income tax, or any F.I.C.A., state disability insurance tax or other employment tax (the date upon which the Company and/or the Employer becomes so obligated shall be referred to herein as the "Withholding Date"), then the Employee shall pay to the Company on the Withholding Date, the minimum aggregate amount that the Company and the Employer are so obligated to withhold, as such amount shall be determined by the Company (the "Minimum Withholding Liability"), which payment shall be made by the automatic cancellation by the Company of a portion of the RSU Shares; provided (such shares of the Company is not then prohibited from purchasing or acquiring such shares of Common Stock (such shares to be valued on the basis of the aggregate Fair Market Value thereof on the Withholding Date); and provided further, that the Employee may, on or before the Withholding Date, irrevocably elect to instead of the Dividend Equivalents associated with such shares to be cancelled shall be those that would otherwise have been delivered to the Employee may, on or before the Withholding Date or made within one business day after however, that the RSU Shares to be cancelled upon settlement of the RSU; and provided further, pay to the Company, by check or wire transfer delivered or made within one business day after the Withholding Date, an amount equal to or greater than the Minimum Withholding Liability.

(b)  The Employee acknowledges that neither the Company nor the Employer has made any representation or given any advice to the Employee with respect to Taxes.

## 6. Recoupment and Forfeiture.

(a)  **Recoupment of Stock Value; Forfeiture of RSUs.**  If the Employee breaches any of the covenants set forth in Section 6(b)(i), (ii) or (iii) hereof during the Applicable Restrictive Period prior to the occurrence of such event, the Employee shall

(i)  **Refund of Stock Value.**  If the Employee breaches any of the covenants set forth in Section 6(b)(i), (ii) or (iii) hereof during the Applicable Restrictive Period prior to the occurrence of such event, then, if the RSU was settled within the one year period prior to any Settlement Date, immediately deliver to the Company an amount in cash equal to the (i) aggregate Fair Market Value, determined as of such Settlement Date, of all RSU Shares which were delivered to the Employee or cancelled in payment of Taxes on such the RSU Shares; and (ii) Dividend Equivalents paid to the Employee in respect of the RSU Shares.

(ii)  **Forfeiture of RSUs.**  If the Employee breaches any of the covenants set forth in Section 6(b)(i), (ii) or (iii) hereof prior to the Settlement Date for the RSU, the RSU shall be terminated and forfeited.

(b)  **Triggering Events.**  The events referred to in Sections 4(c) and 6(a) hereof are as follows:

(i)     Non-Disclosure and Non-Use of Confidential Information.  The Employee agrees not to disclose, use, copy or duplicate or otherwise permit the use, disclosure, copying or duplication of any Confidential Information (other than in connection with authorized activities conducted in the course of the Employee's employment at the Company for the benefit of the Company) during the period of including during his/her employment with the Company or at any time thereafter. The Employee agrees to take all reasonable steps and precautions to prevent any unauthorized disclosure, use, copying or duplication of Confidential Information.

(ii)     Non-Solicitation of the Company's Employees, Clients, and Prospective Clients.  During the time of the Employee's employment and for a period of 24 months thereafter, the Employee shall not, without the express, prior written consent of the Company's General Counsel, engage in any of the conduct described in paragraphs (A) and (B) below, either directly or indirectly, individually or as an employee, agent, contractor, consultant, member, partner, officer, director or stockholder (other than as a stockholder of less than 5% of the equities of a publicly held corporation) or in any other capacity for any person, firm, partnership or corporation:

(A)     hire, attempt to hire or assist any other person or entity in hiring or attempting to hire any current employee of the Company or any person who was a Company employee within the 6-month period preceding such hiring or attempted hiring;

(B)     solicit, divert or cause a reduction in the business or patronage of any Client or Prospective Client.

(iii)     Non-Competition. During the time of the Employee's employment and for a period of 12 months thereafter, the Employee shall not, without the express, prior written consent of the Company's General Counsel, either directly or indirectly, as an employee, agent, contractor, consultant, partner, member, officer, director or stockholder (other than as a stockholder of less than 5% of the equities of a publicly traded corporation), wherever the Company is marketing or providing its services or products, participate in any activity as, or for, a Competitor of the Company which is the same or similar to the activities in which the Employee was involved at the Company.

(c)     Waiver of Recoupment.  Notwithstanding the foregoing, the Employee shall be released from (i) all of his or her obligations under Section 6(a) hereof in the event that a Change in Control occurs within three years prior to the Employment Termination Date, and (ii) some or all of his or her obligations under Section 6(a) hereof in the event that the Committee (if the Employee is an executive officer of the Company) or the Company's Chief Executive Officer (if the Employee is not an executive officer of the Company) shall determine, in their respective sole discretion, that such release is in the best interests of the Company.

5

(d)    Effect on Other Rights and Remedies.  The rights of the Company set forth in this Section 6 shall not limit or restrict in any manner any rights or remedies which the Company or any of its affiliates may have under law or under any separate employment, confidentiality or other agreement with the Employee or otherwise with respect to the events described in Section 6(b) hereof.

(e)    Reasonableness.  The Employee agrees that the terms and conditions set forth in this Section 6 are fair and reasonable and are reasonably required for the protection of the interests of the Company.  If, however, in any judicial proceeding any provision of this Section 6 is found to be so broad as to be unenforceable, the Employee and the Company agree that such provision shall be interpreted to be only so broad as to be enforceable.

(f)    Clawback.  As an additional condition of receiving this Award, the Employee agrees and acknowledges that the Award shall be subject to repayment to the Company in whole or in part in the event of a financial restatement or in such other circumstances as may be required by applicable law or as may be provided in any clawback policy that is adopted by the Company.

7.    **Registration of Units.**

The Employee's right to receive the RSU Shares shall be evidenced by book entry (or by such other manner as the Committee may determine).

8.    **Certain Corporate Transactions.**

In the event that the outstanding securities of any class then comprising the RSU Shares are increased, decreased or exchanged for or converted into cash, property and/or a different number or kind of securities, or cash, property and/or securities are distributed in respect of such outstanding securities, in either case as a result of a reorganization, merger, consolidation, recapitalization, reclassification, dividend (other than a regular, quarterly cash dividend) or other distribution, stock split, reverse stock split or the like, then, unless the Committee shall determine otherwise, the term "RSU Shares," as used in this Agreement, shall, from and after the date of such event, include such cash, property and/or securities so distributed in respect of the RSU Shares, or into or for which the RSU Shares are so increased, decreased, exchanged or converted.

9.    **Shareholder Rights.**

The Employee shall have no rights of a shareholder with respect to RSU Shares subject to this Award unless and until such time as the Award has been settled by the transfer of shares of Common Stock to the Employee.

10.    **Assignment of Award.**

Except as otherwise permitted by the Committee, the Employee's rights under the Plan and this Agreement are personal; no assignment or transfer of the Employee's rights under

and interest in this Award may be made by the Employee other than by will or by the laws of descent and distribution.

## 11. Notices.

Unless the Company notifies the Employee in writing of a different procedure, any notice or other communication to the Company with respect to this Award shall be in writing and shall be:

(a) by registered or certified United States mail, postage prepaid, to Computer Sciences Corporation, Attn: Corporate Secretary, 3170 Fairview Park Drive, Falls Church, VA 22042; or

(b) by hand delivery or otherwise to Computer Sciences Corporation, Attn: Corporate Secretary, 3170 Fairview Park Drive, Falls Church, VA 22042.

Any notices provided for in this Agreement or in the Plan shall be given in writing and shall be deemed effectively delivered or given upon receipt or, in the case of notices delivered by the Company to the Employee, five days after deposit in the United States mail, postage prepaid, addressed to the Employee at the address specified at the end of this Agreement or at such other address as the Employee hereafter designates by written notice to the Company.

## 12. Stock Certificates.

Certificates representing the Common Stock issued pursuant to the Award will bear all legends required by law and necessary or advisable to effectuate the provisions of the Plan and this Award. The Company may place a "stop transfer" order against shares of the Common Stock issued pursuant to this Award until all restrictions and conditions set forth in the Plan or this Agreement and in the legends referred to in this Section 12 have been complied with.

## 13. Successors and Assigns.

This Agreement shall bind and inure to the benefit of and be enforceable by the Employee, the Company and their respective permitted successors and assigns (including personal representatives, heirs and legatees), except that the Employee may not assign any rights or obligations under this Agreement except to the extent and in the manner expressly permitted herein.

## 14. Plan.

The RSU is granted pursuant to the Plan, as in effect on the Grant Date, and is subject to all the terms and conditions of the Plan, as the same may be amended from time to time; provided, however, that no such amendment shall deprive the Employee, without his or her consent, of the RSU or of any of the Employee's rights under this Agreement. The interpretation and construction by the Committee of the Plan, this Agreement and such rules and regulations as may be adopted by the Committee for the purpose of administering the Plan shall be final and

binding upon the Employee. Until the RSU is settled in full, the Company shall, upon written request therefor, send a copy of the Plan, in its then-current form, to the Employee.

### 15.  No Employment Guaranteed.

No provision of this Agreement shall (a) be deemed to form an employment contract or relationship with the Company or any of its subsidiaries, (b) confer upon the Employee any right to be or continue to be in the employ of the Company or any of its subsidiaries, (c) affect the right of the Employer to terminate the employment of the Employee, with or without cause, or (d) confer upon the Employee any right to participate in any employee welfare or benefit plan or other program of the Company or any of its subsidiaries other than the Plan. The Employee hereby acknowledges and agrees that the Employer may terminate the employment of the Employee at any time and for any reason, or for no reason, unless applicable law provides otherwise or unless the Employee and the Employer are parties to a written employment agreement that expressly provides otherwise.

### 16.  Nature of Company Restricted Stock Unit Grants.

The Employee acknowledges and agrees that:

(a)     the Plan was established voluntarily by the Company, it is discretionary in nature and it may be modified, suspended or terminated by the Company at any time, as provided in the Plan and this Agreement;

(b)     the Company grants RSUs voluntarily and on an occasional basis, and the receipt of the RSU by the Employee does not create any contractual or other right to receive any future grant of RSUs, or any benefits in lieu of a grant of RSUs;

(c)     all decisions with respect to future grants of RSUs by the Company will be made in the sole discretion of the Company;

(d)     the Employee is voluntarily participating in the Plan; and

(e)     the future value of the RSU is unknown and cannot be predicted with certainty.

### 17.  Governing Law; Consent to Jurisdiction.

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Nevada, United States of America, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction. Any action, suit or proceeding to enforce the terms and provisions of this Agreement, or to resolve any dispute or controversy arising under or in any way relating to this Agreement, may be brought in the state courts for the County of Washoe, State of Nevada, United States of America, and the parties hereto hereby consent to the jurisdiction of such courts. If the Employee has received this or any other

document related to the Plan translated into a language other than English, and the translated version is different than the English version, the English version will control.

18.     **Entire Agreement; Amendment and Waivers.**

This Agreement embodies the entire understanding and agreement of the parties with respect to the subject matter hereof, and no promise, condition, representation or warranty, express or implied, not stated or incorporated by reference herein, shall bind either party hereto. None of the terms and conditions of this Agreement may be amended, modified, waived or canceled except by a writing, signed by the parties hereto specifying such amendment, modification, waiver or cancellation. A waiver by either party at any time of compliance with any of the terms and conditions of this Agreement shall not be considered a modification, cancellation or consent to a future waiver of such terms and conditions or of any preceding or succeeding breach thereof, unless expressly so stated.

19.     **Section 409A Compliance.**

Payments under this Agreement are designed to be made in a manner that is exempt from or compliant with Section 409A of the U.S. Internal Revenue Code (the "Code") as a "short-term deferral," and the provisions of this Agreement will be administered, interpreted and construed accordingly (or disregarded to the extent such provision cannot be so administered, interpreted, or construed).

Notwithstanding anything to the contrary in this Agreement, if, upon the advice of its counsel, the Company determines that the settlement of an RSU Share pursuant to this Agreement is or may become subject to the additional tax under Section 409A(a)(1)(B) of the Code or any other taxes or penalties imposed under Section 409A ("409A Taxes") as applicable at the time such settlement is otherwise required under this Agreement, then such payment may be delayed to the extent necessary to avoid 409A Taxes. In particular:

(a)     if the Employee is a specified employee within the meaning of Section 409A(a)(2)(B)(i) of the Code on the date of the Employee's "separation from service" (other than due to death) within the meaning of Section 1.409A-1(h) of the Treasury Regulations, such settlement shall be delayed until the earlier of (i) the first business day following the expiration of six months from the Employee's separation from service, (ii) the date of the Employee's death, or (iii) such earlier date as complies with the requirements of Section 409A (the "Settlement Delay Period"); and

(b)     if all or any part of such RSU Share has been converted into cash pursuant to Section 8 hereof, then:

(i)     upon settlement of such RSU Share, such cash shall be increased by an amount equal to interest thereon for the Settlement Delay Period at a rate equal to the default rate credited to amounts deferred under the Company's Deferred Compensation Plan; provided, however, that such rate shall be calculated on a monthly average basis rather than a daily basis; and

      (ii)      the Company shall fund the payment of such cash to the Employee upon settlement of such RSU Share, including the interest to be paid with respect thereto (collectively, the "Delayed Cash Payment"), by establishing and irrevocably funding a trust for the benefit of the Employee, but only if the establishment of such trust does not result in any taxes or penalties becoming due under Section 409A(b). Such trust shall be a grantor trust described in Section 671 of the U.S. Internal Revenue Code and intended not to cause tax to be incurred by the Employee until amounts are paid out from the trust to the Employee. The trust shall provide for distribution of amounts to the Employee in order to pay taxes, if any, that become due on the amounts as to which payment is being delayed during the Settlement Delay Period pursuant to this Section 18, but only to the extent permissible under Section 409A of the U.S. Internal Revenue Code without the imposition of 409A Taxes. The establishment and funding of such trust shall not affect the obligation of the Company to pay the Delayed Cash Payment pursuant to this Section 19.

IN WITNESS WHEREOF, the parties hereto have caused this Award Agreement to be duly executed as of the Grant Date.

EMPLOYEE

_____
John Maguire

The Employee acknowledges receipt of the Plan and a Prospectus relating to this award, and further acknowledges that he or she has reviewed this Agreement and the related documents and accepts the provisions thereof.

_____
John Maguire
305 MAIN STREET
RIDGEFIELD CT 06877
USA

COMPUTER SCIENCES CORPORATION

By: _____
William L. Deckelman, Jr.
Executive Vice President and
General Counsel

## Appendix A

1.    **Definitions.**

For purposes of this Agreement:

(a)    **"Applicable Restrictive Period"** shall mean, with respect to each Settlement Date, the period set forth in Section 6(b)(i), (ii) or (iii) hereof, respectively.

(b)    **"Cause"** shall mean: (A) fraud, misappropriation, embezzlement or other act of material misconduct against the Company or any of its affiliates; (B) conviction of a felony involving a crime of moral turpitude; (C) willful and knowing violation of any rules or regulations of any governmental or regulatory body material to the business of the Company; or (D) substantial and willful failure to render services in accordance with the terms of his or her employment (other than as a result of illness, accident or other physical or mental incapacity), provided that (X) a demand for performance of services has been delivered to the Employee in writing by the Employee's supervisor at least 60 days prior to termination identifying the manner in which such supervisor believes that the Employee has failed to perform and (Y) the Employee has thereafter failed to remedy such failure to perform.

(c)    **"Client"** means any client with respect to whom the Employee provided services, on behalf of whom the Employee transacted business, or with respect to whom the Employee possessed Confidential Information during the 12-month period preceding each of (i) the date the Employee engages in an act described in Section 6(b)(ii)(B) and (ii) the date of the termination of the Employee's employment with the Company for any reason.

(d)    **"Competitor"** means an individual, business or any other entity or enterprise engaged or having publicly announced its intent to engage in business that is substantially similar to the Company's business. For purposes of this Agreement, the parties specifically agree that: the Company is engaged in the business of providing technology-enabled solutions and services; that the Company's capabilities include, but are not limited to, system design and integration, information technology and business process outsourcing, applications software development, Web and application hosting, mission support and management consulting; and that the Company actively solicits business and services clients located throughout the United States and the world.   A non-exhaustive list of the Company's Competitors includes Accenture, Xerox/ACS, HP/EDS, General Dynamics, IBM, L-3 Communications, Lockheed Martin, Northrop Grumman, Dell/Perot Systems, SAIC, Oracle/Sun Microsystems, Unisys Corporation, Infosys, WiPro, Tata, Cognizant, or any subsidiary or affiliate thereof.

(e)    **"Confidential Information"** means all Company trade secrets, patents, copyrights, confidential or proprietary business information and data, sales and financial data, pricing information, manufacturing and distribution methods, information relating to the Company's business plans and strategies including, but not limited to, customers and/or prospects, or lists thereof, marketing plans and procedures, research and development plans,

12

methods of doing business, both technical and non-technical, information relating to the design, architecture, flowcharts, source or object code and documentation of any and all computer software products which the Company has developed, acquired or licensed or is in the process of developing, acquiring or licensing or shall develop, acquire or license in the future, hardware and database technologies or technological information, formulae, designs, process and systems information, intellectual property rights, and any other confidential or proprietary information which relates to the business of the Company or to the business of any client or vendor of the Company or any other party with whom the Company agrees to hold information in confidence, whether patentable, copyrightable or protectable as trade secrets or not. Confidential Information does not include information which is (i) already known by the Employee without an obligation of confidentiality, (ii) publicly known or becomes publicly known through no unauthorized act of the Employee, (iii) rightfully received from a third party without an obligation of confidentiality, (iv) disclosed without similar restrictions by the Company to a third party (other than an affiliate or customer of the Company), or (v) approved by the Company, in writing, for disclosure.

(f)     **"Employer"** shall mean the Employee's employer.

(g)     **"Prospective Client"** means any individual or enterprise who is not a Client but with whom the Company was in active business discussions or negotiations at any time during either (i) the date the Employee engages in an act described in Section 6(b)(ii)(B) or (ii) the 12-month period preceding the termination of the Employee's employment with the Company for any reason and in each case whose identity became known to the Employee in connection with the Employee's relationship with or employment by the Company.

(h)     **"Scheduled Settlement Date"** shall mean the date that is as soon as practicable after the date upon which the Company files with the U.S. Securities and Exchange Commission the Company's Annual Report on Form 10-K for Fiscal Year 3 and calculates the performance results for the performance period pursuant to Appendix C, but in no event later than March 15 of the calendar year following the calendar year in which Fiscal Year 3 ends.

(i)     **"Settlement Date"** shall mean, with respect to each RSU Share, the date upon which the RSU was settled by the delivery of such RSU Share to the Employee or the date upon which such RSU Share was cancelled in payment of Taxes (as hereinafter defined).

(j)     **"RSU Shares"** shall mean the number of shares of Common Stock to be delivered upon settlement of the RSU.

## Appendix B

1. **Data Privacy.**

(a)     In order to implement, administer, manage and account for the Employee's participation in the Plan, the Company and/or the Employer may:

(i)     collect and use certain personal data regarding the Employee, including, without limitation, the Employee's name, home address and telephone number, work address and telephone number, work e-mail address, date of birth, social insurance or other identification number, term of employment, employment status, nationality and tax residence, and details regarding the terms and conditions, grant, vesting, cancellation, termination and expiration of all restricted stock units and other stock based incentives granted, awarded or sold to the Employee by the Company (collectively, the "Data");

(ii)     transfer the Data, in electronic or other form, to employees of the Company and its subsidiaries, and to third parties, who are involved in the implementation, administration and/or management of, and/or accounting for, the Plan, which recipients may be located in the Employee's country or in other countries that may have different data privacy laws and protections than the Employee's country;

(iii)     transfer the Data, in electronic or other form, to a broker or other third party with whom the Employee has elected to deposit any RSU Shares issued in settlement of the RSU; and

(iv)     retain the Data for only as long as may be necessary in order to implement, administer, manage and account for the Employee's participation in the Plan.

(b)     The Employee hereby consents to the collection, use, transfer and retention of the Data, as described in this Agreement, for the exclusive purpose of implementing, administering, managing and accounting for the Employee's participation in the Plan.

(c)     The Employee understands that by contacting his or her local human resources representative, the Employee may:

(i)     view the Data;

(ii)     correct any inaccurate information included within the Data;

(iii)     request additional information regarding the storage and processing of the Data

(iv)     request a list with the names and addresses of any potential recipients of the Data; and

(v)      under certain circumstances and with certain consequences, prevent further use, transfer, retention and/or processing of the Data.

**Appendix C**

**PERFORMANCE SCALE**

The number of RSU Shares to be delivered upon settlement of the RSU, expressed as a percentage of the Target Units, will be determined by the Committee based upon the Company's performance over Fiscal Years 2014-2016 pursuant to the performance scale set forth below.

In determining the number of RSU Shares, performance criteria shall be adjusted to omit the effects of extraordinary items, gain or loss on the disposal of a business segment (other than provisions for operating losses or income during the phase-out period), unusual or infrequently occurring events or transactions that have been publicly disclosed and the cumulative effects of changes in accounting principles, all as determined in accordance with U.S. GAAP.

The Committee may not waive the achievement of the applicable performance goals, and may not increase or decrease the number of RSU Shares determined under the performance scale set forth below, except for those adjustments described in the preceding paragraph.

## EPS Achievement Payout Scale
## FY14 -FY16 PSUs



# EXHIBIT 4

# EXHIBIT 4

# COMPUTER SCIENCES CORPORATION

## 2004 INCENTIVE PLAN

## STOCK OPTION

## AWARD AGREEMENT

### 1.    Grant of Award.

This Agreement ("Agreement") is made and entered into as of **May 16, 2014** (the "Grant Date") by and between Computer Sciences Corporation, a Nevada corporation (the "Company"), and **John Maguire**, a full-time employee of the Company and/or one or more of its subsidiaries (the "Employee").

This Agreement granting the Employee an award under the Plan (the "Award") shall be subject to all of the terms and conditions set forth in the Computer Sciences Corporation 2004 Incentive Plan (the "Plan") and this Agreement.  Except as defined in Appendix A, capitalized terms shall have the same meanings ascribed to them under the Plan.

This Award is subject to the data privacy provisions set forth in Appendix B.

The Company hereby grants to the Employee, and the Employee hereby accepts, an option to purchase **27,998** shares of Common Stock (the "Option Shares") at an exercise price of **$60.90** per share (the "Exercise Price"), which option shall expire at 5:00 p.m., California, U.S.A. time, on **May 16, 2024** (the "Expiration Date") (the "Option").  The Option shall not initially be exercisable to purchase any Option Shares; provided, however, that upon each of the dates indicated below, the Option shall become exercisable to purchase ("vest with respect to") the number of the Option Shares indicated below across from such date:

| Number of Option Shares Vesting | Date |
|---|---|
| 9,333 | May 16, 2015 |
| 9,333 | May 16, 2016 |
| 9,332 | May 16, 2017 |

### 2.    Termination of Employment;  Acceleration and Termination of Options.

(a)    Termination of Status as an Employee.

(i)    Termination at Age 62 or Older Other than due to Cause, Death or Disability.

COMPLETED

(A)    If the Employee's status as an employee of the Company or any of its subsidiaries is terminated at age 62 or older for no reason, or for any reason other than Cause, death or Disability, then:

(1)    if the Employee shall have been (or for any other purpose shall have been treated as if he or she had been) a continuous employee of the Company or its subsidiaries for at least 10 years immediately prior to the date of termination of employment status (the "Employment Termination Date"), then (a) the portion of the Option that has not vested on or prior to such date shall fully vest immediately prior to such date, and (b) subject to Section 2(b) hereof, the Option shall terminate upon the earlier of the Expiration Date or the third anniversary of the Employment Termination Date; and

(2)    if the Employee shall not have been (and shall not for any other purpose have been treated as if he or she had been) a continuous employee of the Company or its subsidiaries for at least 10 years immediately prior to the Employment Termination Date, then, subject to Sections 2(a)(ii) and 2(b) hereof (a) the portion of the Option that has not vested on or prior to such date shall terminate on such date, and (b) the remaining vested portion of the Option shall terminate upon the earlier of the Expiration Date or the third anniversary of the Employment Termination Date.

(ii)    <u>Leave of Absence</u>. If, prior to the exercise of the Option in full, the Employee takes a leave of absence (including a military leave of absence), the Employee and the Company each reasonably anticipate that the Employee will return to active employment and either (x) the leave of absence is to be for not more than six months or (y) at all times during the leave of absence the Employee has a statutory or contractual right to return to work, then:

(A)    while on leave of absence the Employee shall be treated as if he were an active employee;

(B)    if the Employee's leave of absence is terminated and the Employee does not return to active employment, the date of the end of the leave of absence shall be treated as the date on which the Employee has a termination of employment; and

(C)    if the Employee's leave of absence is terminated and the Employee returns to active employment, he shall be treated as if active employment had continued uninterrupted during the leave of absence.

(iii)    <u>Death or Disability</u>. If the Employee's status as an employee of the Company or any of its subsidiaries is terminated by reason of the death or

Disability of the Employee, then (1) the portion of the Option that has not vested on or prior to the Employment Termination Date shall fully vest on such date and (2) the Option shall terminate upon the earlier of the Expiration Date or the fifth anniversary of the Employment Termination Date.

(iv)     Other Termination at Age 61 or Younger.  If the Employee's status as an employee of the Company or any of its subsidiaries is terminated at age 61 or younger for no reason, or for any reason other than Cause, death, Disability, permanent or temporary lay off, or approved leave of absence, then (1) the portion of the Option that has not vested on or prior to the Employment Termination Date shall terminate on such date and (2) the remaining vested portion of the Option shall terminate upon the earlier of the Expiration Date or three months after the Employment Termination Date.

(b)     Death Following Termination of Employment.  Notwithstanding anything to the contrary in this Agreement, if the Employee shall die at any time after the termination of his or her status as an employee of the Company or any of its subsidiaries and at a time when the Option is vested and exercisable, then the Option shall remain exercisable until, and shall terminate upon, the earlier of the Expiration Date or the fifth anniversary of the date of such death.

(c)     Termination for Cause.  If the Employee's status as an employee of the Company or any of its subsidiaries is terminated for Cause, then both the vested and unvested portion of the Option shall terminate on such date.

(d)     Acceleration of Option.

(i)     The Committee, in its sole discretion, may accelerate the exercisability of the Option at any time and for any reason.

(ii)     Notwithstanding anything to the contrary in this Agreement, upon a Change in Control: (1) the portion of the Option then outstanding that has not vested on or prior thereto shall fully vest and (2) the Option shall remain exercisable until, and shall terminate upon, the earlier of the Expiration Date or, if applicable, the fifth anniversary of the date of the Employee's death.

(e)     Certain Events Causing Termination of Option.  Notwithstanding anything to the contrary in this Agreement, the Option shall terminate upon the consummation of any of the following events, or, if later, the thirtieth day following the first date upon which such event shall have been approved by both the Board of Directors and the stockholders of the Company, or upon such later date as shall be determined by the Committee:

(i)     the dissolution or liquidation of the Company;

(ii)     a sale of substantially all of the property and assets of the Company, unless the terms of such sale shall provide otherwise; or

(iii)    a reorganization, merger or consolidation of the Company that results in the outstanding securities of any class then subject to the Option being exchanged for or converted into cash, property and/or securities not issued by the Company, unless the terms of such reorganization, merger or consolidation provide otherwise.

3.    **Payment of Taxes**.

(a)    If the Company and/or the Employer are obligated to withhold an amount on account of any federal, state or local tax imposed as a result of the exercise of the Option (collectively, "Taxes"), including, without limitation, any federal, state or other income tax, or any F.I.C.A., state disability insurance tax or other employment tax, then, concurrently with such exercise, the Employee shall pay to the Company, by check, the minimum aggregate amount that the Company and the Employer are so obligated to withhold, as such amount shall be determined by the Company (the "Minimum Withholding Liability"); provided, however, that the Employee may instead, on or before the exercise of the Option, irrevocably elect to pay all or any part of the Minimum Withholding Liability by either of the following methods:

(i)    pursuant to the Company's cashless exercise program; or

(ii)    by instructing the Company to withhold shares of Common Stock otherwise issuable upon such exercise of the Option (such withholding to be valued on the basis of the aggregate Fair Market Value of the withheld shares on the date of such exercise); and

provided that the Company is not then prohibited from purchasing or acquiring such shares of Common Stock, and provided, further, however, that if all of such payment is made by check and/or pursuant to the Company's cashless exercise program, then the Employee shall be entitled, but not obligated, so to pay an amount that is greater than the Minimum Withholding Liability.

(b)    The Employee acknowledges that neither the Company nor the Employer has made any representation or given any advice to the Employee with respect to Taxes.

4.    **Recoupment and Forfeiture**.

(a)    <u>Refund of Option Gains; Termination of Options</u>.    If the Employee breaches any of the covenants set forth in Section 4(b)(i), (ii) or (iii) hereof during the Applicable Restrictive Period for such exercise, then:

(i)    <u>Refund of Option Gains</u>. If the Employee has exercised the Option within the one year period prior to the occurrence of the Employee's breach of any of the covenants set forth in Section 4(b)(i), (ii) or (iii) hereof, the Employee shall immediately deliver to the Company with respect to such exercise, an amount in cash equal to:

(A)     the aggregate Fair Market Value, determined as of the Option Exercise Date, of the shares of Common Stock issued upon such exercise; minus

(B)     the aggregate exercise price paid, whether in cash or by the delivery or withholding of shares of Common Stock, upon such exercise.

(ii)     Termination of All Options.  All outstanding Options shall be terminated and forfeited.

(b)     Triggering Events.  The events referred to in Section 4(a) hereof are as follows:

(i)     Non-Disclosure and Non-Use of Confidential Information.  The Employee agrees not to disclose, use, copy or duplicate or otherwise permit the use, disclosure, copying or duplication of any Confidential Information (other than in connection with authorized activities conducted in the course of the Employee's employment at the Company for the benefit of the Company) during the period of including during his/her employment with the Company or at any time thereafter. The Employee agrees to take all reasonable steps and precautions to prevent any unauthorized disclosure, use, copying or duplication of Confidential Information.

(ii)     Non-Solicitation of the Company's Employees, Clients, and Prospective Clients.  During the time of the Employee's employment and for a period of 24 months thereafter, the Employee shall not, without the express, prior written consent of the Company's General Counsel, engage in any of the conduct described in paragraphs (A) and (B) below, either directly or indirectly, individually or as an employee, agent, contractor, consultant, member, partner, officer, director or stockholder (other than as a stockholder of less than 5% of the equities of a publicly held corporation) or in any other capacity for any person, firm, partnership or corporation:

(A)     hire, attempt to hire or assist any other person or entity in hiring or attempting to hire any current employee of the Company or any person who was a Company employee within the 6-month period preceding such hiring or attempted hiring;

(B)     solicit, divert or cause a reduction in the business or patronage of any Client or Prospective Client.

(iii)     Non-Competition.  During the time of the Employee's employment and for a period of 12 months thereafter, the Employee shall not, without the express, prior written consent of the Company's General Counsel, either directly or indirectly, as an employee, agent, contractor, consultant, partner, member, officer, director or stockholder (other than as a stockholder of less than 5% of the

equities of a publicly traded corporation), wherever the Company is marketing or providing its services or products, participate in any activity as, or for, a Competitor of the Company which is the same or similar to the activities in which the Employee was involved at the Company.

(c)     Waiver of Recoupment.  Notwithstanding the foregoing, the Employee shall be released from (i) all of his or her obligations under Section 4(a) hereof in the event that a Change in Control occurs within three years prior to the Employment Termination Date, and (ii) some or all of his or her obligations under Section 4(a) hereof in the event that the Committee (if the Employee is an executive officer of the Company) or the Company's Chief Executive Officer (if the Employee is not an executive officer of the Company) shall determine, in their respective sole discretion, that such release is in the best interests of the Company.

(d)     Effect on Other Rights and Remedies.  The rights of the Company set forth in this Section 4 shall not limit or restrict in any manner any rights or remedies which the Company or any of its affiliates may have under law or under any separate employment, confidentiality or other agreement with the Employee or otherwise with respect to the events described in Section 4(b) hereof.

(e)     Reasonableness.  The Employee agrees that the terms and conditions set forth in Section 4 hereof are fair and reasonable and are reasonably required for the protection of the interests of the Company.  If, however, in any judicial proceeding any provision of Section 4 hereof is found to be so broad as to be unenforceable, the Employee and the Company agree that such provision shall be interpreted to be only so broad as to be enforceable.

(f)     Clawback.  As an additional condition of receiving this Award, the Employee agrees and acknowledges that the Award shall be subject to repayment to the Company in whole or in part in the event of a financial restatement or in such other circumstances as may be required by applicable law or as may be provided in any clawback policy that is adopted by the Company.

5.     Adjustments.  In the event that the outstanding securities of the class then subject to the Option are increased, decreased or exchanged for or converted into cash, property and/or a different number or kind of securities, or cash, property and/or securities are distributed in respect of such outstanding securities, in either case as a result of a reorganization, merger, consolidation, recapitalization, reclassification, dividend (other than a regular, quarterly cash dividend) or other distribution, stock split, reverse stock split or the like, or in the event that substantially all of the property and assets of the Company are sold, then, unless such event shall cause the Option to terminate pursuant to Section 2(e) hereof, the Committee shall make appropriate and proportionate adjustments in the number and type of shares or other securities or cash or other property that may thereafter be acquired upon the exercise of the Option; provided, however, that any such adjustments in the Option shall be made without changing the aggregate Exercise Price of the then unexercised portion of the Option.

6.     Exercise.  The Option shall be exercisable during the Employee's lifetime only by the Employee or by his or her guardian or legal representative, and after the Employee's

death only by the person or entity entitled to do so under the Employee's last will and testament or applicable intestate law. The Option may only be exercised by the delivery to the Company of a written notice of such exercise, in the form specified by the Company, which notice shall, among other things, specify the number of Option Shares to be purchased and the aggregate Exercise Price for such shares, together with payment in full of such aggregate Exercise Price by check or pursuant to the Company's cashless exercise program; provided, however, that payment of such aggregate Exercise Price may instead be made, in whole or in part, by the delivery to the Company of shares of Common Stock (including Option Shares otherwise issuable upon such exercise), which delivery effectively transfers to the Company good and valid title to such shares, free and clear of any pledge, commitment, lien, claim or other encumbrance (such shares to be valued on the basis of the aggregate Fair Market Value thereof on the date of such exercise), provided that the Company is not then prohibited from purchasing or acquiring such shares of Common Stock.

7.  **Notices.**

Unless the Company notifies the Employee in writing of a different procedure, any notice or other communication to the Company with respect to this Award shall be in writing and shall be:

(a)  by registered or certified United States mail, postage prepaid, to Computer Sciences Corporation, Attn: Corporate Secretary, 3170 Fairview Park Drive, Falls Church, VA 22042; or

(b)  by hand delivery or otherwise to Computer Sciences Corporation, Attn: Corporate Secretary, 3170 Fairview Park Drive, Falls Church, VA 22042.

Any notices provided for in this Agreement or in the Plan shall be given in writing and shall be deemed effectively delivered or given upon receipt or, in the case of notices delivered by the Company to the Employee, five days after deposit in the United States mail, postage prepaid, addressed to the Employee at the address specified at the end of this Agreement or at such other address as the Employee hereafter designates by written notice to the Company.

8.  **Stock Exchange Requirements; Applicable Laws.** Notwithstanding anything to the contrary in this Agreement, no Option Shares purchased upon exercise of the Option, and no certificate representing all or any part of such shares, shall be issued or delivered if, in the opinion of counsel to the Company, such issuance or delivery would cause the Company to be in violation of, or to incur liability under, any securities law, or any rule, regulation or procedure of any U.S. national securities exchange upon which any securities of the Company are listed, or any listing agreement with any such securities exchange, or any other requirement of law or of any administrative or regulatory body having jurisdiction over the Company.

9.  **Nontransferability.** Neither the Option nor any interest therein may be sold, assigned, conveyed, gifted, pledged, hypothecated or otherwise transferred in any manner other than by will or the laws of descent and distribution.

10.    **Plan.**  The Option is granted pursuant to the Plan, as in effect on the Grant Date, and is subject to all the terms and conditions of the Plan, as the same may be amended from time to time; provided, however, that no such amendment shall deprive the Employee, without his or her consent, of the Option or of any of the Employee's rights under this Agreement.  The interpretation and construction by the Committee of the Plan, this Agreement, the Option and such rules and regulations as may be adopted by the Committee for the purpose of administering the Plan shall be final and binding upon the Employee.  Until the Option shall expire, terminate or be exercised in full, the Company shall, upon written request therefor, send a copy of the Plan, in its then-current form, to the Employee or any other person or entity then entitled to exercise the Option.

11.    **Stockholder Rights.**  No person or entity shall be entitled to vote, receive dividends or be deemed for any purpose the holder of any Option Shares until the Option shall have been duly exercised to purchase such Option Shares in accordance with the provisions of this Agreement.

12.    **Nature of Company Option Grants.**  The Employee acknowledges and agrees that:

(a)    the Plan was established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, as provided in the Plan;

(b)    the grant of the Option is voluntary and occasional and does not create any contractual or other right to receive any future Option grants, or any benefits in lieu of Options, even if the Employee has repeatedly received Option grants in the past;

(c)    all decisions with respect to future grants of Options by the Company will be at the sole discretion of the Company;

(d)    the Employee's participation in the Plan shall not create a right to further employment with the Employer and shall not interfere with the ability of the Employer to terminate the Employee's employment relationship at any time with or without Cause;

(e)    the Employee is voluntarily participating in the Plan;

(f)    in the event that the Employee is not an employee of the Company, the Option grant will not be interpreted to form an employment contract or relationship with the Company; and furthermore, the Option grant will not be interpreted to form an employment contract with the Employer or any Subsidiary of the Company;

(g)    the future value of the underlying Option Shares is unknown and cannot be predicted with certainty;

(h)    if the underlying Option Shares do not increase in value, the Option will have no value; and

(i)     if the Employee exercises the Option, the value of the Option Shares acquired upon exercise may increase or decrease in value, even below the Exercise Price;

13.     **Successors.** The Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, on the one hand, and the Employee and his or her heirs, beneficiaries, legatees and personal representatives, on the other hand.

14.     **Entire Agreement; Amendments and Waivers.** The Agreement embodies the entire understanding and agreement of the parties with respect to the subject matter hereof, and no promise, condition, representation or warranty, express or implied, not stated or incorporated by reference herein, shall bind either party hereto. None of the terms and conditions of the Agreement may be amended, modified, waived or canceled except by a writing, signed by the parties hereto specifying such amendment, modification, waiver or cancellation. A waiver by either party at any time of compliance with any of the terms and conditions of the Agreement shall not be considered a modification, cancellation or consent to a future waiver of such terms and conditions or of any preceding or succeeding breach thereof, unless expressly so stated.

15.     **Governing Law; Consent to Jurisdiction.** The Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Nevada, United States of America, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of the Agreement to the substantive law of another jurisdiction. Any action, suit or proceeding to enforce the terms and provisions of the Agreement, or to resolve any dispute or controversy arising under or in any way relating to the Agreement, may be brought in the state courts for the County of Washoe, State of Nevada, United States of America, and the parties hereto hereby consent to the jurisdiction of such courts.

16.     **Language.** If the Employee has received the Agreement or any other document related to the Plan translated into a language other than English, and the translated version is different than the English version, the English version will control.

17.     **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents related to the Option granted under and participation in the Plan or future Options that may be granted under the Plan by electronic means or to request the Employee's consent to participate in the Plan by electronic means. The Employee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

18.     **Severability.** Any provision of the Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of the Agreement invalid, illegal or unenforceable in any other jurisdiction.

**Appendix A**

1.    **Definitions.**

For purposes of this Agreement:

(a)    "**Applicable Restrictive Period**" shall mean, with respect to each exercise of an Option, the period set forth in Section 4(b)(i), (ii) or (iii) hereof, respectively.

(b)    "**Cause**" shall mean: (A) fraud, misappropriation, embezzlement or other act of material misconduct against the Company or any of its affiliates; (B) conviction of a felony involving a crime of moral turpitude; (C) willful and knowing violation of any rules or regulations of any governmental or regulatory body material to the business of the Company; or (D) substantial and willful failure to render services in accordance with the terms of his or her employment (other than as a result of illness, accident or other physical or mental incapacity), provided that (X) a demand for performance of services has been delivered to the Employee in writing by the Employee's supervisor at least 60 days prior to termination identifying the manner in which such supervisor believes that the Employee has failed to perform and (Y) the Employee has thereafter failed to remedy such failure to perform.

(c)    "**Change in Control**" means the consummation of a "change in ownership" of the Company, a "change in effective control" of the Company or a "change in the ownership of a substantial portion of the assets" of the Company, and in each case, as defined under Code Section 409A.

(d)    "**Client**" means any client with respect to whom the Employee provided services, on behalf of whom the Employee transacted business, or with respect to whom the Employee possessed Confidential Information during the 12-month period preceding each of (i) the date the Employee engages in an act described in Section 4(b)(ii)(B) and (ii) the date of the termination of the Employee's employment with the Company for any reason.

(e)    "**Common Stock**" means the Common Stock, par value $1.00 per share, of the Company.

(f)    "**Competitor**" means an individual, business or any other entity or enterprise engaged or having publicly announced its intent to engage in business that is substantially similar to the Company's business. For purposes of this Agreement, the parties specifically agree that: the Company is engaged in the business of providing technology-enabled solutions and services; that the Company's capabilities include, but are not limited to, system design and integration, information technology and business process outsourcing, applications software development, Web and application hosting, mission support and management consulting; and that the Company actively solicits business and services clients located throughout the United States and the world.    A non-exhaustive list of the Company's Competitors includes Accenture, Xerox/ACS, HP/EDS, General Dynamics, IBM, L-3 Communications, Lockheed Martin, Northrop Grumman, Dell/Perot Systems, SAIC, Oracle/Sun

Microsystems, Unisys Corporation, Infosys, WiPro, Tata, Cognizant, or any subsidiary or affiliate thereof.

(g) "**Confidential Information**" means all Company trade secrets, patents, copyrights, confidential or proprietary business information and data, sales and financial data, pricing information, manufacturing and distribution methods, information relating to the Company's business plans and strategies including, but not limited to, customers and/or prospects, or lists thereof, marketing plans and procedures, research and development plans, methods of doing business, both technical and non-technical, information relating to the design, architecture, flowcharts, source or object code and documentation of any and all computer software products which the Company has developed, acquired or licensed or is in the process of developing, acquiring or licensing or shall develop, acquire or license in the future, hardware and database technologies or technological information, formulae, designs, process and systems information, intellectual property rights, and any other confidential or proprietary information which relates to the business of the Company or to the business of any client or vendor of the Company or any other party with whom the Company agrees to hold information in confidence, whether patentable, copyrightable or protectable as trade secrets or not. Confidential Information does not include information which is (i) already known by the Employee without an obligation of confidentiality, (ii) publicly known or becomes publicly known through no unauthorized act of the Employee, (iii) rightfully received from a third party without an obligation of confidentiality, (iv) disclosed without similar restrictions by the Company to a third party (other than an affiliate or customer of the Company), or (v) approved by the Company, in writing, for disclosure.

(h) "**Disability**" means, unless otherwise provided in an Award Agreement, a disability that entitles the Employee to benefits under the Company's long-term disability plan, as may be in effect from time to time, as determined by the plan administrator of the long-term disability plan, or if the Employee is not a participant under the Company's long-term disability plan, as determined if the Employee were a participant in a long-term disability plan that covers similarly situated employees. Notwithstanding the foregoing, if an Award is subject to Code Section 409A and Disability is a payment event, the definition of Disability shall conform to the requirements of Treasury Regulation § 1.409A-3(i)(4)(i).

(i) "**Employer**" shall mean the Employee's employer.

(j) "**Option Exercise Date**" shall mean, with respect to each exercise of an Option, the date upon which such Option is exercised.

(k) "**Prospective Client**" means any individual or enterprise who is not a Client but with whom the Company was in active business discussions or negotiations at any time during either (i) the date the Employee engages in an act described in Section 4(b)(ii)(B) or (ii) the 12-month period preceding the termination of the Employee's employment with the Company for any reason and in each case whose identity became known to the Employee in connection with the Employee's relationship with or employment by the Company.

**Appendix B**

1.    **Data Privacy.**

(a)    In order to implement, administer, manage and account for the Employee's participation in the Plan, the Company and/or the Employer may:

(i)    collect and use certain personal data regarding the Employee, including, without limitation, the Employee's name, home address and telephone number, work address and telephone number, work e-mail address, date of birth, social insurance or other identification number, term of employment, employment status, salary, nationality and tax residence, and any details regarding the terms and conditions, grant, vesting, exercise, cancellation, termination and expiration of all stock options and other stock based incentives granted, awarded or sold to the Employee by the Company (collectively, the "Data");

(ii)    transfer the Data to any third parties who may be involved in the implementation, administration and/or management of the Plan, which recipients may be located in the Employee's country or in other countries that may have different data privacy laws and protections than the Employee's country;

(iii)    transfer the Data to a broker or other third party with whom the Employee has elected to deposit any Option Shares acquired upon exercise of the Option; and

(iv)    retain the Data for only as long as may be necessary in order to implement, administer, manage and account for the Employee's participation in the Plan.

(b)    The Employee hereby explicitly and unambiguously consents to the collection, use, transfer and retention of the Data, as described in this Agreement, in electronic or other form, for the exclusive purpose of implementing, administering, managing and accounting for the Employee's participation in the Plan.

(c)    The Employee understands that by contacting his or her local human resources representative, the Employee may:

(i)    view the Data;

(ii)    correct any inaccurate information included within the Data;

(iii)    request additional information regarding the storage and processing of the Data; and

(iv)    request a list with the names and addresses of any potential recipients of the Data.

    (d)    The Employee understands that he or she may refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. The Employee understands, however, that refusing or withdrawing his or her consent may affect his or her ability to participate in the Plan. For more information on the consequences of the Employee's refusal to consent or withdrawal of consent, the Employee understands that he or she may contact his or her local human resources representative.

# EXHIBIT 5

# EXHIBIT 5

COMPUTER SCIENCES CORPORATION

2011 OMNIBUS INCENTIVE PLAN

CAREER SHARES RESTRICTED STOCK UNIT

AWARD AGREEMENT

1.     **Grant of Award.**

This Agreement ("Agreement") is made and entered into as of **May 16, 2014** (the "Grant Date") by and between Computer Sciences Corporation, a Nevada corporation (the "Company"), and **John Maguire**, a full-time employee of the Company and/or one or more of its subsidiaries (the "Employee").

This Agreement granting the Employee an award under the Plan (the "Award") shall be subject to all of the terms and conditions set forth in the Computer Sciences Corporation 2011 Omnibus Incentive Plan (the "Plan") and this Agreement. Except as defined in Appendix A, capitalized terms shall have the same meanings ascribed to them under the Plan.

This Award is subject to the data privacy provisions set forth in Appendix B.

Award Granted: **3,325** Restricted Stock Units (the "RSU Shares")

2.     **Settlement of RSUs.**

(a)     Subject to the provisions of Section 3 below, the Restricted Stock Units ("RSU") shall be settled by the Company delivering to the Employee (or after the Employee's death, the beneficiary designated by the Employee for such purpose), on the Settlement Dates indicated below, the number of shares of Common Stock indicated below across from such dates, together with Dividend Equivalents.

| Shares | Settlement Date |
|---|---|
| 10% of RSU Shares | 1st Anniversary of the Employment Termination Date |
| 10% of RSU Shares | 2nd Anniversary of the Employment Termination Date |
| 10% of RSU Shares | 3rd Anniversary of the Employment Termination Date |
| 10% of RSU Shares | 4th Anniversary of the Employment Termination Date |
| 10% of RSU Shares | 5th Anniversary of the Employment Termination Date |
| 10% of RSU Shares | 6th Anniversary of the Employment Termination Date |
| 10% of RSU Shares | 7th Anniversary of the Employment Termination Date |
| 10% of RSU Shares | 8th Anniversary of the Employment Termination Date |
| 10% of RSU Shares | 9th Anniversary of the Employment Termination Date |
| 10% of RSU Shares | 10th Anniversary of the Employment Termination Date |




3.      **Events Altering Settlement Date of RSUs; Cancellation.**

(a)      <u>Death or Disability</u>.

(i)      Notwithstanding anything to the contrary in this Agreement, if the Employee shall die at any time prior to the settlement in full of the RSU, then, one calendar month after such death, all unsettled RSUs shall be settled.

(ii)      If, prior to the Retirement Date, the Employee's status as an employee of the Company or any of its subsidiaries is terminated by reason of the Disability of the Employee, then, one calendar month after such Employment Termination Date, the Company shall complete the settlement in full of the RSU.

(iii)      If settlement is by reason of termination due to death, settlement shall be to the beneficiary designated by the Employee for such purpose.

(b)      <u>Cancellation of RSU upon Other Termination of Employment</u>. If, prior to the Retirement Date, the Employee's status as an employee of the Company or any of its subsidiaries is voluntarily or involuntarily terminated other than by reason of the death or Disability of the Employee, then a percentage of the RSU and all related Dividend Equivalents shall automatically be cancelled as of the close of business on such Employment Termination Date. The percentage of the RSU and related Dividend Equivalents cancelled will be determined based upon the Employee's age on the Employment Termination Date and the Employee's years of continuous service with the Company or its subsidiaries completed immediately prior to the Employment Termination Date, as set forth in the following table:

| Years of Continuous Service | Age | Percentage of RSU Cancelled |
| --- | --- | --- |
| Any number of years | Younger than 55 | 100% |
| Less than 5 years | Any age | 100% |
| At least 5 years but less than 6 years | 55 or older | 50% |
| At least 6 years but less than 7 years | 55 or older | 40% |
| At least 7 years but less than 8 years | 55 or older | 30% |
| At least 8 years but less than 9 years | 55 or older | 20% |
| At least 9 years but less than 10 years | 55 or older | 10% |
| 10 or more years | 55 or older | 0% |

(c)      <u>Change in Control</u>. Notwithstanding anything to the contrary in this Agreement, if there is a Change in Control at any time prior to the settlement in full of the RSU, then, upon the Change in Control, the RSU shall be settled in full.

(d)    Cancellation of RSU after Employment Termination Date.   After the Employment Termination Date but prior to the earlier of (1) the settlement in full of the RSU or (2) a Change in Control, the RSU and all related Dividend Equivalents not previously cancelled may be cancelled if, in the judgment of the Board of Directors of the Company, upon the advice of counsel, the Employee, directly or indirectly:

(i)    breaches any obligation to the Company under any agreement relating to assignment of inventions, disclosure of information or data, or similar matters; or

(ii)    competes with the Company, or renders competitive services (as a director, officer, employee, consultant or otherwise) to, or owns more than a 5% interest in, any person or entity that competes with the Company; or

(iii)    solicits, diverts or takes away any person who is an employee of the Company or advises or induces any employee to terminate his or her employment with the Company; or

(iv)    solicits, diverts or takes away any person or entity that is a customer of the Company, or advises or induces any customer or potential customer not to do business with the Company; or

(v)    discloses to any person or entity other than the Company, or makes any use of, any information relating to the technology, know how, products, business or data of the Company or its subsidiaries, suppliers, licensors or customers, including but not limited to the names, addresses and special requirements of the customers of the Company.

(e)    Clawback.   As an additional condition of receiving this Award, the Employee agrees and acknowledges that the Award shall be subject to repayment to the Company in whole or in part in the event of a financial restatement or in such other circumstances as may be required by applicable law or as may be provided in any clawback policy that is adopted by the Company.

4.    **Withholding and Taxes.**

(a)    If the Company and/or the Employer are obligated to withhold an amount on account of any federal, state or local tax imposed as a result of the grant or settlement of the RSU pursuant to this Agreement (collectively, "Taxes"), including, without limitation, any federal, state or other income tax, or any F.I.C.A., state disability insurance tax or other employment tax (the date upon which the Company and/or the Employer becomes so obligated shall be referred to herein as the "Withholding Date"), then the Employee shall pay to the Company on the Withholding Date, the minimum aggregate amount that the Company and the Employer are so obligated to withhold, as such amount shall be determined by the Company (the "Minimum Withholding Liability"), which payment shall be made by the automatic cancellation by the Company of a portion of the RSU Shares; provided that the Company is not then

3

prohibited from purchasing or acquiring such shares of Common Stock (such shares to be valued on the basis of the aggregate Fair Market Value thereof on the Withholding Date, plus the value of the Dividend Equivalents associated with such shares on the Withholding Date); and provided further that the RSU Shares to be cancelled shall be those that would otherwise have been delivered to the Employee the soonest upon settlement of the RSU; and provided further, however, that the Employee may, on or before the Withholding Date, irrevocably elect to instead pay to the Company, by check or wire transfer delivered or made within one business day after the Withholding Date, an amount equal to or greater than the Minimum Withholding Liability.

(b)     The Employee acknowledges that neither the Company nor the Employer has made any representation or given any advice to the Employee with respect to Taxes.

5.     **Registration of Units.**

The Employee's right to receive the RSU Shares shall be evidenced by book entry (or by such other manner as the Committee may determine).

6.     **Certain Corporate Transactions.**

In the event that the outstanding securities of any class then comprising the RSU Shares are increased, decreased or exchanged for or converted into cash, property and/or a different number or kind of securities, or cash, property and/or securities are distributed in respect of such outstanding securities, in either case as a result of a reorganization, merger, consolidation, recapitalization, reclassification, dividend (other than a regular, quarterly cash dividend) or other distribution, stock split, reverse stock split or the like, then, unless the Committee shall determine otherwise, the term "RSU Shares," as used in this Agreement, shall, from and after the date of such event, include such cash, property and/or securities so distributed in respect of the RSU Shares, or into or for which the RSU Shares are so increased, decreased, exchanged or converted.

7.     **Shareholder Rights.**

The Employee shall have no rights of a shareholder with respect to RSU Shares subject to this Award unless and until such time as the Award has been settled by the transfer of shares of Common Stock to the Employee.

8.     **Assignment of Award.**

Except as otherwise permitted by the Committee, the Employee's rights under the Plan and this Agreement are personal; no assignment or transfer of the Employee's rights under and interest in this Award may be made by the Employee other than by will or by the laws of descent and distribution.

4

9. **Notices.**

Unless the Company notifies the Employee in writing of a different procedure, any notice or other communication to the Company with respect to this Award shall be in writing and shall be:

(a)     by registered or certified United States mail, postage prepaid, to Computer Sciences Corporation, Attn: Corporate Secretary, 3170 Fairview Park Drive, Falls Church, VA 22042; or

(b)     by hand delivery or otherwise to Computer Sciences Corporation, Attn: Corporate Secretary, 3170 Fairview Park Drive, Falls Church, VA 22042.

Any notices provided for in this Agreement or in the Plan shall be given in writing and shall be deemed effectively delivered or given upon receipt or, in the case of notices delivered by the Company to the Employee, five days after deposit in the United States mail, postage prepaid, addressed to the Employee at the address specified at the end of this Agreement or at such other address as the Employee hereafter designates by written notice to the Company.

10. **Stock Certificates.**

Certificates representing the Common Stock issued pursuant to the Award will bear all legends required by law and necessary or advisable to effectuate the provisions of the Plan and a "stop transfer" order against shares of the Common Stock issued pursuant to this Award until all restrictions and conditions set forth in the Plan or this Agreement and in the legends referred to in this Section 10 have been complied with.

11. **Successors and Assigns.**

This Agreement shall bind and inure to the benefit of and be enforceable by the Employee, the Company and their respective permitted successors and assigns (including personal representatives, heirs and legatees), except that the Employee may not assign any rights or obligations under this Agreement except to the extent and in the manner expressly permitted herein.

12. **Plan.**

The RSU is granted pursuant to the Plan, as in effect on the Grant Date, and is subject to all the terms and conditions of the Plan, as the same may be amended from time to time; provided, however, that no such amendment shall deprive the Employee, without his or her consent, of the RSU or of any of the Employee's rights under this Agreement. The interpretation and construction by the Committee of the Plan, this Agreement and such rules and regulations as may be adopted by the Committee for the purpose of administering the Plan shall be final and binding upon the Employee. Until the RSU is settled in full, the Company shall, upon written request therefor, send a copy of the Plan, in its then-current form, to the Employee.

13. **No Employment Guaranteed.**

No provision of this Agreement shall (a) be deemed to form an employment contract or relationship with the Company or any of its subsidiaries, (b) confer upon the Employee any right to be or continue to be in the employ of the Company or any of its subsidiaries, (c) affect the right of the Employer to terminate the employment of the Employee, with or without cause, or (d) confer upon the Employee any right to participate in any employee welfare or benefit plan or other program of the Company or any of its subsidiaries other than the Plan. The Employee hereby acknowledges and agrees that the Employer may terminate the employment of the Employee at any time and for any reason, or for no reason, unless applicable law provides otherwise or unless the Employee and the Employer are parties to a written employment agreement that expressly provides otherwise.

14. **Nature of Company Restricted Stock Unit Grants.**

The Employee acknowledges and agrees that:

(a)     the Plan was established voluntarily by the Company, it is discretionary in nature and it may be modified, suspended or terminated by the Company at any time, as provided in the Plan and this Agreement;

(b)     the Company grants RSUs voluntarily and on an occasional basis, and the receipt of the RSU by the Employee does not create any contractual or other right to receive any future grant of RSUs, or any benefits in lieu of a grant of RSUs;

(c)     all decisions with respect to future grants of RSUs by the Company will be made in the sole discretion of the Company;

(d)     the Employee is voluntarily participating in the Plan; and

(e)     the future value of the RSU is unknown and cannot be predicted with certainty.

15. **Governing Law; Consent to Jurisdiction.**

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Nevada, United States of America, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction. Any action, suit or proceeding to enforce the terms and provisions of this Agreement, or to resolve any dispute or controversy arising under or in any way relating to this Agreement, may be brought in the state courts for the County of Washoe, State of Nevada, United States of America, and the parties hereto hereby consent to the jurisdiction of such courts. If the Employee has received this or any other document related to the Plan translated into a language other than English, and the translated version is different than the English version, the English version will control.

16.     **Entire Agreement; Amendment and Waivers.**

This Agreement embodies the entire understanding and agreement of the parties with respect to the subject matter hereof, and no promise, condition, representation or warranty, express or implied, not stated or incorporated by reference herein, shall bind either party hereto. None of the terms and conditions of this Agreement may be amended, modified, waived or canceled except by a writing, signed by the parties hereto specifying such amendment, modification, waiver or cancellation. A waiver by either party at any time of compliance with any of the terms and conditions of this Agreement shall not be considered a modification, cancellation or consent to a future waiver of such terms and conditions or of any preceding or succeeding breach thereof, unless expressly so stated.

17.     **Section 409A Compliance.**

Payments under this Agreement are designed to be made in a manner that is exempt from or compliant with Section 409A of the U.S. Internal Revenue Code (the "Code") as a "short-term deferral," and the provisions of this Agreement will be administered, interpreted and construed accordingly (or disregarded to the extent such provision cannot be so administered, interpreted, or construed).

Notwithstanding anything to the contrary in this Agreement, if, upon the advice of its counsel, the Company determines that the settlement of an RSU Share pursuant to this Agreement is or may become subject to the additional tax under Section 409A(a)(1)(B) of the Code or any other taxes or penalties imposed under Section 409A ("409A Taxes") as applicable at the time such settlement is otherwise required under this Agreement, then such payment may be delayed to the extent necessary to avoid 409A Taxes. In particular:

(a)     if the Employee is a specified employee within the meaning of Section 409A(a)(2)(B)(i) of the Code on the date of the Employee's "separation from service" (other than due to death) within the meaning of Section 1.409A-1(h) of the Treasury Regulations, such settlement shall be delayed until the earlier of (i) the first business day following the expiration of six months from the Employee's separation from service, (ii) the date of the Employee's death, or (iii) such earlier date as complies with the requirements of Section 409A (the "Settlement Delay Period"); and

(b)     if all or any part of such RSU Share has been converted into cash pursuant to Section 6 hereof, then:

(i)     upon settlement of such RSU Share, such cash shall be increased by an amount equal to interest thereon for the Settlement Delay Period at a rate equal to the default rate credited to amounts deferred under the Company's Deferred Compensation Plan; provided, however, that such rate shall be calculated on a monthly average basis rather than a daily basis; and

(ii)     the Company shall fund the payment of such cash to the Employee upon settlement of such RSU Share, including the interest to be paid with respect thereto (collectively, the "Delayed Cash Payment"), by establishing and

7

irrevocably funding a trust for the benefit of the Employee, but only if the establishment of such trust does not result in any taxes or penalties becoming due under Section 409A(b).  Such trust shall be a grantor trust described in Section 671 of the U.S. Internal Revenue Code and intended not to cause tax to be incurred by the Employee until amounts are paid out from the trust to the Employee.  The trust shall provide for distribution of amounts to the Employee in order to pay taxes, if any, that become due on the amounts as to which payment is being delayed during the Settlement Delay Period pursuant to this Section 17, but only to the extent permissible under Section 409A of the U.S. Internal Revenue Code without the imposition of 409A Taxes.  The establishment and funding of such trust shall not affect the obligation of the Company to pay the Delayed Cash Payment pursuant to this Section 17.

IN WITNESS WHEREOF, the parties hereto have caused this Award Agreement to be duly executed as of the Grant Date.

EMPLOYEE

_____
John Maguire

The Employee acknowledges receipt of the Plan and a Prospectus relating to this award, and further acknowledges that he or she has reviewed this Agreement and the related documents and accepts the provisions thereof.

_____
John Maguire
305 MAIN STREET
RIDGEFIELD CT 06877
USA

COMPUTER SCIENCES CORPORATION

By: _____
William L. Deckelman, Jr.
Executive Vice President and
General Counsel

**Appendix A**

1. **Definitions.**

For purposes of this Agreement:

(a)   "**Cause**" shall mean: (A) fraud, misappropriation, embezzlement or other act of material misconduct against the Company or any of its affiliates; (B) conviction of a felony involving a crime of moral turpitude; (C) willful and knowing violation of any rules or regulations of any governmental or regulatory body material to the business of the Company; or (D) substantial and willful failure to render services in accordance with the terms of his or her employment (other than as a result of illness, accident or other physical or mental incapacity), provided that (X) a demand for performance of services has been delivered to the Employee in writing by the Employee's supervisor at least 60 days prior to termination identifying the manner in which such supervisor believes that the Employee has failed to perform and (Y) the Employee has thereafter failed to remedy such failure to perform.

(b)   "**Employer**" shall mean the Employee's employer.

(c)   "**Employment Termination Date**" shall mean the date the Employee's status as an employee of the Company or any of its subsidiaries is voluntarily or involuntarily terminated.

(d)   "**Retirement Date**" shall mean the date that the Employee's status as an employee of the Company or any of its subsidiaries is terminated, provided that on such date either (i) the Employee is age 62 or older, or (ii) the Employee is age 55 or older and shall have been (or for any other purpose shall have been treated as if he or she had been) a continuous employee of the Company or its subsidiaries for at least 10 years immediately prior thereto, or (iii) such termination has been specifically approved by the Committee as a "retirement" for purposes of this Agreement.

(e)   "**Settlement Date**" shall mean, with respect to each RSU Share, the date upon which the RSU was settled by the delivery of such RSU Share to the Employee or the date upon which such RSU Share was cancelled in payment of Taxes (as hereinafter defined).

(f)   "**RSU Shares**" shall mean the number of shares of Common Stock to be delivered upon settlement of the RSU.

**Appendix B**

1.    **Data Privacy.**

(a)    In order to implement, administer, manage and account for the Employee's participation in the Plan, the Company and/or the Employer may:

(i)    collect and use certain personal data regarding the Employee, including, without limitation, the Employee's name, home address and telephone number, work address and telephone number, work e-mail address, date of birth, social insurance or other identification number, term of employment, employment status, nationality and tax residence, and details regarding the terms and conditions, grant, vesting, cancellation, termination and expiration of all restricted stock units and other stock based incentives granted, awarded or sold to the Employee by the Company (collectively, the "Data");

(ii)    transfer the Data, in electronic or other form, to employees of the Company and its subsidiaries, and to third parties, who are involved in the implementation, administration and/or management of, and/or accounting for, the Plan, which recipients may be located in the Employee's country or in other countries that may have different data privacy laws and protections than the Employee's country;

(iii)    transfer the Data, in electronic or other form, to a broker or other third party with whom the Employee has elected to deposit any RSU Shares issued in settlement of the RSU; and

(iv)    retain the Data for only as long as may be necessary in order to implement, administer, manage and account for the Employee's participation in the Plan.

(b)    The Employee hereby consents to the collection, use, transfer and retention of the Data, as described in this Agreement, for the exclusive purpose of implementing, administering, managing and accounting for the Employee's participation in the Plan.

(c)    The Employee understands that by contacting his or her local human resources representative, the Employee may:

(i)    view the Data;

(ii)    correct any inaccurate information included within the Data;

(iii)    request additional information regarding the storage and processing of the Data

(iv)    request a list with the names and addresses of any potential recipients of the Data; and

11

(v)     under certain circumstances and with certain consequences, prevent further use, transfer, retention and/or processing of the Data.

# EXHIBIT 6

# EXHIBIT 6

# COMPUTER SCIENCES CORPORATION

## 2011 OMNIBUS INCENTIVE PLAN

### PERFORMANCE BASED RESTRICTED STOCK UNIT

### AWARD AGREEMENT

1.  **Grant of Award.**

This Agreement ("Agreement") is made and entered into as of **May 16, 2014** (the "Grant Date") by and between Computer Sciences Corporation, a Nevada corporation (the "Company"), and **John Maguire**, a full-time employee of the Company and/or one or more of its subsidiaries (the "Employee").

This Agreement granting the Employee an award under the Plan (the "Award") shall be subject to all of the terms and conditions set forth in the Computer Sciences Corporation 2011 Omnibus Incentive Plan (the "Plan") and this Agreement. Except as defined in Appendix A, capitalized terms shall have the same meanings ascribed to them under the Plan.

This Award is subject to the data privacy provisions set forth in Appendix B.

Award Granted: **13,798** Restricted Stock Units (the "Target Units")

2.  **Normal Settlement of RSUs.**

(a)     The total number of RSU Shares delivered in settlement of this Award shall be between 0% and 200%, inclusive, of the number of Target Units and, except as otherwise provided in this Agreement, shall be determined by the Committee pursuant to Appendix C to this Agreement based on the Company's performance for FY2017 ("Fiscal Year 3"). Dividend Equivalents will be paid with respect to such RSU Shares delivered in settlement at the same time as the Restricted Stock Units ("RSUs") are settled.

(b)     For purposes of this Section 2, this Award shall be settled on the Scheduled Settlement Date. The total number of RSU Shares delivered in settlement of the Award pursuant to this Section 2 shall be reduced by the number of RSU Shares, if any, delivered in settlement of the Award pursuant to Section 3 below. That is, to the extent a portion of the Award has vested and been settled pursuant to Section 3 below, that portion shall not again be settled under the provisions of this Section 2.

3.  **Prorated Settlement of RSUs.**

(a)     The RSUs shall vest and be settled as to 25% of the Target Units if the Committee determines that the Company's performance for FY2015 ("Fiscal Year 1") is at or above the threshold level of performance specified in Appendix C to this Agreement.

1

(b)     If the Company's performance for Fiscal Year 1 is such that no portion of the RSUs vest and are settled under Section 3(a), then the RSUs shall vest and be settled as to 25% of the Target Units if the Committee determines that the Company's performance for FY2016 ("Fiscal Year 2") is at or above the threshold level of performance specified in Appendix C to this Agreement.

(c)     If the Company's performance for Fiscal Year 1 is such that a portion of the RSUs vest and are settled under Section 3(a), then the RSUs shall vest and be settled as to an additional 25% of the Target Units if the Committee determines that the Company's performance for Fiscal Year 2 is at or above the level of performance that results in a 75% payout pursuant to Appendix C to this Agreement.  For the avoidance of doubt, up to 50% of the Target Units may vest and be settled under the provisions of this Section 3.

(d)     RSUs that vest pursuant to the provisions of this Section 3 shall be settled as soon as practicable after the date upon which the Company files with the U.S. Securities and Exchange Commission the Company's Annual Report on Form 10-K for the applicable fiscal year and calculates the performance results for the applicable performance period pursuant to Appendix C, but in no event later than March 15 of the calendar year following the calendar year in which the applicable fiscal year ends.  Dividend Equivalents will be paid with respect to such RSU Shares delivered in settlement at the same time as the RSUs are settled.

4.     **Effect of Termination of Employment; Approved Termination; Change in Control; Recoupment and Forfeiture.**

(a)     Age 62 or Older Other than for Cause, death or Disability with at least 10 Years of Service; Approved Termination.  If, prior to the Scheduled Settlement Date:

(i)     the Employee's status as an employee of the Company or any of its subsidiaries is terminated after the end of Fiscal Year 1 and during Fiscal Year 2 or Fiscal Year 3 at age 62 or older for no reason, or for any reason other than Cause, death or Disability, and the Employee shall have been (or for any other purpose shall have been treated as if he or she had been) a continuous employee of the Company or its subsidiaries for at least 10 years immediately prior to the date of termination of employment status; or

(ii)     the Employee's status as an employee of the Company or any of its subsidiaries is terminated at any time during the term of the Award and such termination is specifically approved by the Committee for purposes of this Section 4(a),

then the Company shall settle a fraction of the unvested portion of the RSU that otherwise would settle in accordance with Section 2, Section 3 (if applicable), and Appendix C of this Agreement on the applicable Settlement Date.  This fraction will be determined by calculating the number of full months of continuous service with the Company or its subsidiaries that the Employee has completed since the Grant Date and then dividing this number by 36.

(b)    Death or Disability.

(i)    If, on or before the end of Fiscal Year 3, the Employee's status as an employee of the Company or any of its subsidiaries is terminated by reason of the death or Disability of the Employee, then, one calendar month after the Employee's status as an employee of the Company or its subsidiaries is terminated (the "Employment Termination Date") the Company shall settle the unvested portion of the RSUs in full by delivering a pro-rated amount of the Target Units in accordance with Section 2, with such pro-ration based on the Employee's period of service during the applicable performance period.

(ii)    If, after the end of Fiscal Year 3 and prior to the Scheduled Settlement Date, the Employee's status as an employee of the Company or any of its subsidiaries is terminated by reason of the death or Disability of the Employee, then the Company shall settle the unvested portion of the RSUs in accordance with Section 2 and Appendix C of this Agreement, without pro-ration, as soon as practicable after the Employment Termination Date, but in no event later than the Scheduled Settlement Date.

(iii)    If settlement is by reason of termination due to death, settlement shall be to the beneficiary designated by the Employee for such purpose.

(c)    Cancellation of RSU upon Other Termination of Employment.  If, prior to the last day of Fiscal Year 3, the Employee's status as an employee of the Company or any of its subsidiaries is voluntarily or involuntarily terminated other than pursuant to Section 4(a) or (b) hereof, then any unvested portion of the RSU and all related Dividend Equivalents shall automatically be cancelled as of the close of business on the Employment Termination Date.

(d)    Change in Control.

(i)    Upon a Change in Control that occurs on or before the end of Fiscal Year 3, the Company shall settle the unvested portion of the RSUs in full, without pro-ration, by delivering the Target Units within 10 days after the Change in Control.

(ii)    Upon a Change in Control that occurs after the end of Fiscal Year 3 and prior to the Scheduled Settlement Date, the Company shall settle the unvested portion of the RSUs in accordance with Section 2 and Appendix C of this Agreement, without pro ration, as soon as practicable after the Change in Control, but in no event later than the Scheduled Settlement Date.

(e)    Recoupment and Forfeiture.  Settlement of all or a portion of the Award pursuant to this Section 4 is subject to the forfeiture provisions of this Section 4.  Settlement of all or a portion of the Award is subject to recoupment by the Company pursuant to Section 6.

(f)    Leave of Absence.  If the Employee is granted a leave of absence

3

(including a military leave of absence), the Employee and the Company each reasonably anticipate that the Employee will return to active employment and either (x) the leave of absence is to be for not more than six months or (y) at all times during the leave of absence the Employee has a statutory or contractual right to return to work, then for purposes of this Award: (i) while on leave of absence the Employee shall be treated as if he were an active employee; (ii) if the Employee's leave of absence is terminated and the Employee does not timely return to active employment, the date of the end of the leave of absence shall be treated as the date on which the Employee has a termination of employment; (iii) if the Employee's leave of absence is terminated and the Employee timely returns to active employment, he shall be treated as if active employment had continued uninterrupted during the leave of absence; and (iv) if the Employee's leave of absence continues to the Scheduled Settlement Date or a settlement date set forth in Section 3(d) above, any vested RSUs which the Employee would otherwise be entitled to receive if he were an active employee shall be settled on such date.

5. **Withholding and Taxes.**

(a) If the Company and/or the Employer are obligated to withhold an amount on account of any federal, state or local tax imposed as a result of the grant or settlement of the RSU pursuant to this Agreement (collectively, "Taxes"), including, without limitation, any federal, state or other income tax, or any F.I.C.A., state disability insurance tax or other employment tax (the date upon which the Company and/or the Employer becomes so obligated shall be referred to herein as the "Withholding Date"), then the Employee shall pay to the Company on the Withholding Date, the minimum aggregate amount that the Company and the Employer are so obligated to withhold, as such amount shall be determined by the Company (the "Minimum Withholding Liability"), which payment shall be made by the automatic cancellation by the Company of a portion of the RSU Shares; provided that the Company is not then prohibited from purchasing or acquiring such shares of Common Stock (such shares to be valued on the basis of the aggregate Fair Market Value thereof on the Withholding Date, plus the value of the Dividend Equivalents associated with such shares on the Withholding Date); and provided further that the RSU Shares to be cancelled shall be those that would otherwise have been delivered to the Employee the soonest upon settlement of the RSU; and provided further, however, that the Employee may, on or before the Withholding Date, irrevocably elect to instead pay to the Company, by check or wire transfer delivered or made within one business day after the Withholding Date, an amount equal to or greater than the Minimum Withholding Liability.

(b) The Employee acknowledges that neither the Company nor the Employer has made any representation or given any advice to the Employee with respect to Taxes.

6. **Recoupment and Forfeiture.**

(a) Refund of Stock Value; Forfeiture of RSUs.

(i) Refund of Stock Value. If the Employee breaches any of the covenants set forth in Section 6(b)(i), (ii) or (iii) hereof during the Applicable Restrictive Period for any Settlement Date, then, if the RSU was settled within the

one year period prior to the occurrence of such event, the Employee shall immediately deliver to the Company an amount in cash equal to the (i) aggregate Fair Market Value, determined as of such Settlement Date, of all RSU Shares which were delivered to the Employee or cancelled in payment of Taxes on such Settlement Date and (ii) Dividend Equivalents paid to the Employee in respect of the RSU Shares.

(ii) <u>Forfeiture of RSUs</u>. If the Employee breaches any of the covenants set forth in Section 6(b)(i), (ii) or (iii) hereof prior to the Settlement Date for the RSU, the RSU shall be terminated and forfeited.

(b) <u>Triggering Events</u>. The events referred to in Sections 4(e) and 6(a) hereof are as follows:

(i) <u>Non-Disclosure and Non-Use of Confidential Information</u>. The Employee agrees not to disclose, use, copy or duplicate or otherwise permit the use, disclosure, copying or duplication of any Confidential Information (other than in connection with authorized activities conducted in the course of the Employee's employment at the Company for the benefit of the Company) during the period of including during his/her employment with the Company or at any time thereafter. The Employee agrees to take all reasonable steps and precautions to prevent any unauthorized disclosure, use, copying or duplication of Confidential Information.

(ii) <u>Non-Solicitation of the Company's Employees, Clients, and Prospective Clients</u>. During the time of the Employee's employment and for a period of 24 months thereafter, the Employee shall not, without the express, prior written consent of the Company's General Counsel, engage in any of the conduct described in paragraphs (A) and (B) below, either directly or indirectly, individually or as an employee, agent, contractor, consultant, member, partner, officer, director or stockholder (other than as a stockholder of less than 5% of the equities of a publicly held corporation) or in any other capacity for any person, firm, partnership or corporation:

(A) hire, attempt to hire or assist any other person or entity in hiring or attempting to hire any current employee of the Company or any person who was a Company employee within the 6-month period preceding such hiring or attempted hiring;

(B) solicit, divert or cause a reduction in the business or patronage of any Client or Prospective Client.

(iii) <u>Non-Competition</u>. During the time of the Employee's employment and for a period of 12 months thereafter, the Employee shall not, without the express, prior written consent of the Company's General Counsel, either directly or indirectly, as an employee, agent, contractor, consultant, partner, member,

officer, director or stockholder (other than as a stockholder of less than 5% of the equities of a publicly traded corporation), wherever the Company is marketing or providing its services or products, participate in any activity as, or for, a Competitor of the Company which is the same or similar to the activities in which the Employee was involved at the Company.

(c)    <u>Waiver of Recoupment</u>. Notwithstanding the foregoing, the Employee shall be released from (i) all of his or her obligations under Section 6(a) hereof in the event that a Change in Control occurs within three years prior to the Employment Termination Date, and (ii) some or all of his or her obligations under Section 6(a) hereof in the event that the Committee (if the Employee is an executive officer of the Company) or the Company's Chief Executive Officer (if the Employee is not an executive officer of the Company) shall determine, in their respective sole discretion, that such release is in the best interests of the Company.

(d)    <u>Effect on Other Rights and Remedies</u>. The rights of the Company set forth in this Section 6 shall not limit or restrict in any manner any rights or remedies which the Company or any of its affiliates may have under law or under any separate employment, confidentiality or other agreement with the Employee or otherwise with respect to the events described in Section 6(b) hereof.

(e)    <u>Reasonableness</u>. The Employee agrees that the terms and conditions set forth in this Section 6 are fair and reasonable and are reasonably required for the protection of the interests of the Company. If, however, in any judicial proceeding any provision of this Section 6 is found to be so broad as to be unenforceable, the Employee and the Company agree that such provision shall be interpreted to be only so broad as to be enforceable.

(f)    <u>Clawback</u>. As an additional condition of receiving this Award, the Employee agrees and acknowledges that the Award shall be subject to repayment to the Company in whole or in part in the event of a financial restatement or in such other circumstances as may be required by applicable law or as may be provided in any clawback policy that is adopted by the Company.

7.    **Registration of Units.**

The Employee's right to receive the RSU Shares shall be evidenced by book entry (or by such other manner as the Committee may determine).

8.    **Certain Corporate Transactions.**

In the event that the outstanding securities of any class then comprising the RSU Shares are increased, decreased or exchanged for or converted into cash, property and/or a different number or kind of securities, or cash, property and/or securities are distributed in respect of such outstanding securities, in either case as a result of a reorganization, merger, consolidation, recapitalization, reclassification, dividend (other than a regular, quarterly cash dividend) or other distribution, stock split, reverse stock split or the like, then, unless the Committee shall determine otherwise, the term "RSU Shares," as used in this Agreement, shall,

from and after the date of such event, include such cash, property and/or securities so distributed in respect of the RSU Shares, or into or for which the RSU Shares are so increased, decreased, exchanged or converted.

9. **Shareholder Rights.**

The Employee shall have no rights of a shareholder with respect to RSU Shares subject to this Award unless and until such time as the Award has been settled by the transfer of shares of Common Stock to the Employee.

10. **Assignment of Award.**

Except as otherwise permitted by the Committee, the Employee's rights under the Plan and this Agreement are personal; no assignment or transfer of the Employee's rights under and interest in this Award may be made by the Employee other than by will or by the laws of descent and distribution.

11. **Notices.**

Unless the Company notifies the Employee in writing of a different procedure, any notice or other communication to the Company with respect to this Award shall be in writing and shall be:

(a)    by registered or certified United States mail, postage prepaid, to Computer Sciences Corporation, Attn: Corporate Secretary, 3170 Fairview Park Drive, Falls Church, VA 22042; or

(b)    by hand delivery or otherwise to Computer Sciences Corporation, Attn: Corporate Secretary, 3170 Fairview Park Drive, Falls Church, VA 22042.

Any notices provided for in this Agreement or in the Plan shall be given in writing and shall be deemed effectively delivered or given upon receipt or, in the case of notices delivered by the Company to the Employee, five days after deposit in the United States mail, postage prepaid, addressed to the Employee at the address specified at the end of this Agreement or at such other address as the Employee hereafter designates by written notice to the Company.

12. **Stock Certificates.**

Certificates representing the Common Stock issued pursuant to the Award will bear all legends required by law and necessary or advisable to effectuate the provisions of the Plan and this Award. The Company may place a "stop transfer" order against shares of the Common Stock issued pursuant to this Award until all restrictions and conditions set forth in the Plan or this Agreement and in the legends referred to in this Section 12 have been complied with.

13. **Successors and Assigns.**

This Agreement shall bind and inure to the benefit of and be enforceable by the Employee, the Company and their respective permitted successors and assigns (including personal representatives, heirs and legatees), except that the Employee may not assign any rights or obligations under this Agreement except to the extent and in the manner expressly permitted herein.

14. **Plan.**

The RSU is granted pursuant to the Plan, as in effect on the Grant Date, and is subject to all the terms and conditions of the Plan, as the same may be amended from time to time; provided, however, that no such amendment shall deprive the Employee, without his or her consent, of the RSU or of any of the Employee's rights under this Agreement. The interpretation and construction by the Committee of the Plan, this Agreement and such rules and regulations as may be adopted by the Committee for the purpose of administering the Plan shall be final and binding upon the Employee. Until the RSU is settled in full, the Company shall, upon written request therefor, send a copy of the Plan, in its then-current form, to the Employee.

15. **No Employment Guaranteed.**

No provision of this Agreement shall (a) be deemed to form an employment contract or relationship with the Company or any of its subsidiaries, (b) confer upon the Employee any right to be or continue to be in the employ of the Company or any of its subsidiaries, (c) affect the right of the Employer to terminate the employment of the Employee, with or without cause, or (d) confer upon the Employee any right to participate in any employee welfare or benefit plan or other program of the Company or any of its subsidiaries other than the Plan. The Employee hereby acknowledges and agrees that the Employer may terminate the employment of the Employee at any time and for any reason, or for no reason, unless applicable law provides otherwise or unless the Employee and the Employer are parties to a written employment agreement that expressly provides otherwise.

16. **Nature of Company Restricted Stock Unit Grants.**

The Employee acknowledges and agrees that:

(a)    the Plan was established voluntarily by the Company, it is discretionary in nature and it may be modified, suspended or terminated by the Company at any time, as provided in the Plan and this Agreement;

(b)    the Company grants RSUs voluntarily and on an occasional basis, and the receipt of the RSU by the Employee does not create any contractual or other right to receive any future grant of RSUs, or any benefits in lieu of a grant of RSUs;

(c)    all decisions with respect to future grants of RSUs by the Company will be made in the sole discretion of the Company;

8

(d)    the Employee is voluntarily participating in the Plan; and

(e)    the future value of the RSU is unknown and cannot be predicted with certainty.

17.    **Governing Law; Consent to Jurisdiction.**

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Nevada, United States of America, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction. Any action, suit or proceeding to enforce the terms and provisions of this Agreement, or to resolve any dispute or controversy arising under or in any way relating to this Agreement, may be brought in the state courts for the County of Washoe, State of Nevada, United States of America, and the parties hereto hereby consent to the jurisdiction of such courts. If the Employee has received this or any other document related to the Plan translated into a language other than English, and the translated version is different than the English version, the English version will control.

18.    **Entire Agreement; Amendment and Waivers.**

This Agreement embodies the entire understanding and agreement of the parties with respect to the subject matter hereof, and no promise, condition, representation or warranty, express or implied, not stated or incorporated by reference herein, shall bind either party hereto. None of the terms and conditions of this Agreement may be amended, modified, waived or canceled except by a writing, signed by the parties hereto specifying such amendment, modification, waiver or cancellation. A waiver by either party at any time of compliance with any of the terms and conditions of this Agreement shall not be considered a modification, cancellation or consent to a future waiver of such terms and conditions or of any preceding or succeeding breach thereof, unless expressly so stated.

19.    **Section 409A Compliance.**

Payments under this Agreement are designed to be made in a manner that is exempt from or compliant with Section 409A of the U.S. Internal Revenue Code (the "Code") as a "short-term deferral," and the provisions of this Agreement will be administered, interpreted and construed accordingly (or disregarded to the extent such provision cannot be so administered, interpreted, or construed).

Notwithstanding anything to the contrary in this Agreement, if, upon the advice of its counsel, the Company determines that the settlement of an RSU Share pursuant to this Agreement is or may become subject to the additional tax under Section 409A(a)(1)(B) of the Code or any other taxes or penalties imposed under Section 409A ("409A Taxes") as applicable at the time such settlement is otherwise required under this Agreement, then such payment may be delayed to the extent necessary to avoid 409A Taxes. In particular:

(a)    if the Employee is a specified employee within the meaning of Section 409A(a)(2)(B)(i) of the Code on the date of the Employee's "separation from service" (other

than due to death) within the meaning of Section 1.409A-1(h) of the Treasury Regulations, such settlement shall be delayed until the earlier of (i) the first business day following the expiration of six months from the Employee's separation from service, (ii) the date of the Employee's death, or (iii) such earlier date as complies with the requirements of Section 409A (the "Settlement Delay Period"); and

(b)    if all or any part of such RSU Share has been converted into cash pursuant to Section 8 hereof, then:

(i)    upon settlement of such RSU Share, such cash shall be increased by an amount equal to interest thereon for the Settlement Delay Period at a rate equal to the default rate credited to amounts deferred under the Company's Deferred Compensation Plan; provided, however, that such rate shall be calculated on a monthly average basis rather than a daily basis; and

(ii)   the Company shall fund the payment of such cash to the Employee upon settlement of such RSU Share, including the interest to be paid with respect thereto (collectively, the "Delayed Cash Payment"), by establishing and irrevocably funding a trust for the benefit of the Employee, but only if the establishment of such trust does not result in any taxes or penalties becoming due under Section 409A(b). Such trust shall be a grantor trust described in Section 671 of the U.S. Internal Revenue Code and intended not to cause tax to be incurred by the Employee until amounts are paid out from the trust to the Employee. The trust shall provide for distribution of amounts to the Employee in order to pay taxes, if any, that become due on the amounts as to which payment is being delayed during the Settlement Delay Period pursuant to this Section 18, but only to the extent permissible under Section 409A of the U.S. Internal Revenue Code without the imposition of 409A Taxes. The establishment and funding of such trust shall not affect the obligation of the Company to pay the Delayed Cash Payment pursuant to this Section 19.

IN WITNESS WHEREOF, the parties hereto have caused this Award Agreement to be duly executed as of the Grant Date.

EMPLOYEE

COMPUTER SCIENCES CORPORATION

John Maguire

By: _____

William L. Deckelman, Jr.
Executive Vice President and
General Counsel

The Employee acknowledges receipt of the Plan and a Prospectus relating to this award, and further acknowledges that he or she has reviewed this Agreement and the related documents and accepts the provisions thereof.

John Maguire
305 MAIN STREET
RIDGEFIELD CT 06877
USA

## Appendix A

1.  **Definitions.**

For purposes of this Agreement:

(a)  **"Applicable Restrictive Period"** shall mean, with respect to each Settlement Date, the period set forth in Section 6(b)(i), (ii) or (iii) hereof, respectively.

(b)  **"Cause"** shall mean: (A) fraud, misappropriation, embezzlement or other act of material misconduct against the Company or any of its affiliates; (B) conviction of a felony involving a crime of moral turpitude; (C) willful and knowing violation of any rules or regulations of any governmental or regulatory body material to the business of the Company; or (D) substantial and willful failure to render services in accordance with the terms of his or her employment (other than as a result of illness, accident or other physical or mental incapacity), provided that (X) a demand for performance of services has been delivered to the Employee in writing by the Employee's supervisor at least 60 days prior to termination identifying the manner in which such supervisor believes that the Employee has failed to perform and (Y) the Employee has thereafter failed to remedy such failure to perform.

(c)  **"Client"** means any client with respect to whom the Employee provided services, on behalf of whom the Employee transacted business, or with respect to whom the Employee possessed Confidential Information during the 12-month period preceding each of (i) the date the Employee engages in an act described in Section 6(b)(ii)(B) and (ii) the date of the termination of the Employee's employment with the Company for any reason.

(d)  **"Competitor"** means an individual, business or any other entity or enterprise engaged or having publicly announced its intent to engage in business that is substantially similar to the Company's business. For purposes of this Agreement, the parties specifically agree that: the Company is engaged in the business of providing technology-enabled solutions and services; that the Company's capabilities include, but are not limited to, system design and integration, information technology and business process outsourcing, applications software development, Web and application hosting, mission support and management consulting; and that the Company actively solicits business and services clients located throughout the United States and the world. A non-exhaustive list of the Company's Competitors includes Accenture, Xerox/ACS, HP/EDS, General Dynamics, IBM, L-3 Communications, Lockheed Martin, Northrop Grumman, Dell/Perot Systems, SAIC, Oracle/Sun Microsystems, Unisys Corporation, Infosys, WiPro, Tata, Cognizant, or any subsidiary or affiliate thereof.

(e)  **"Confidential Information"** means all Company trade secrets, patents, copyrights, confidential or proprietary business information and data, sales and financial data, pricing information, manufacturing and distribution methods, information relating to the Company's business plans and strategies including, but not limited to, customers and/or prospects, or lists thereof, marketing plans and procedures, research and development plans,

methods of doing business, both technical and non-technical, information relating to the design, architecture, flowcharts, source or object code and documentation of any and all computer software products which the Company has developed, acquired or licensed or is in the process of developing, acquiring or licensing or shall develop, acquire or license in the future, hardware and database technologies or technological information, formulae, designs, process and systems information, intellectual property rights, and any other confidential or proprietary information which relates to the business of the Company or to the business of any client or vendor of the Company or any other party with whom the Company agrees to hold information in confidence, whether patentable, copyrightable or protectable as trade secrets or not. Confidential Information does not include information which is (i) already known by the Employee without an obligation of confidentiality, (ii) publicly known or becomes publicly known through no unauthorized act of the Employee, (iii) rightfully received from a third party without an obligation of confidentiality, (iv) disclosed without similar restrictions by the Company to a third party (other than an affiliate or customer of the Company), or (v) approved by the Company, in writing, for disclosure.

(f) **"Employer"** shall mean the Employee's employer.

(g) **"Prospective Client"** means any individual or enterprise who is not a Client but with whom the Company was in active business discussions or negotiations at any time during either (i) the date the Employee engages in an act described in Section 6(b)(ii)(B) or (ii) the 12-month period preceding the termination of the Employee's employment with the Company for any reason and in each case whose identity became known to the Employee in connection with the Employee's relationship with or employment by the Company.

(h) **"Scheduled Settlement Date"** shall mean the date that is as soon as practicable after the date upon which the Company files with the U.S. Securities and Exchange Commission the Company's Annual Report on Form 10-K for Fiscal Year 3 and calculates the performance results for the performance period pursuant to Appendix C, but in no event later than March 15 of the calendar year following the calendar year in which Fiscal Year 3 ends.

(i) **"Settlement Date"** shall mean, with respect to each RSU Share, the date upon which the RSU was settled by the delivery of such RSU Share to the Employee or the date upon which such RSU Share was cancelled in payment of Taxes (as hereinafter defined).

(j) **"RSU Shares"** shall mean the number of shares of Common Stock to be delivered upon settlement of the RSU.

## Appendix B

1.   **Data Privacy.**

(a)   In order to implement, administer, manage and account for the Employee's participation in the Plan, the Company and/or the Employer may:

(i)   collect and use certain personal data regarding the Employee, including, without limitation, the Employee's name, home address and telephone number, work address and telephone number, work e-mail address, date of birth, social insurance or other identification number, term of employment, employment status, nationality and tax residence, and details regarding the terms and conditions, grant, vesting, cancellation, termination and expiration of all restricted stock units and other stock based incentives granted, awarded or sold to the Employee by the Company (collectively, the "Data");

(ii)   transfer the Data, in electronic or other form, to employees of the Company and its subsidiaries, and to third parties, who are involved in the implementation, administration and/or management of, and/or accounting for, the Plan, which recipients may be located in the Employee's country or in other countries that may have different data privacy laws and protections than the Employee's country;

(iii)   transfer the Data, in electronic or other form, to a broker or other third party with whom the Employee has elected to deposit any RSU Shares issued in settlement of the RSU; and

(iv)   retain the Data for only as long as may be necessary in order to implement, administer, manage and account for the Employee's participation in the Plan.

(b)   The Employee hereby consents to the collection, use, transfer and retention of the Data, as described in this Agreement, for the exclusive purpose of implementing, administering, managing and accounting for the Employee's participation in the Plan.

(c)   The Employee understands that by contacting his or her local human resources representative, the Employee may:

(i)   view the Data;

(ii)   correct any inaccurate information included within the Data;

(iii)   request additional information regarding the storage and processing of the Data

(iv)     request a list with the names and addresses of any potential recipients of the Data; and

(v)     under certain circumstances and with certain consequences, prevent further use, transfer, retention and/or processing of the Data.

## Appendix C

## PERFORMANCE SCALE

The number of RSU Shares to be delivered upon settlement of the RSU, expressed as a percentage of the Target Units, will be determined by the Committee based upon the Company's performance over Fiscal Years 2015-2017 pursuant to the performance scale set forth below.

In determining the number of RSU Shares, performance criteria shall be adjusted to omit the effects of extraordinary items, gain or loss on the disposal of a business segment (other than provisions for operating losses or income during the phase-out period), unusual or infrequently occurring events or transactions that have been publicly disclosed and the cumulative effects of changes in accounting principles, all as determined in accordance with U.S. GAAP.

The Committee may not waive the achievement of the applicable performance goals, and may not increase or decrease the number of RSU Shares determined under the performance scale set forth below, except for those adjustments described in the preceding paragraph.

# Fiscal 2015 PSU Grants
## Fiscal 2017 EPS Achievement Payout Scale



FY2017

# EXHIBIT 7

# EXHIBIT 7

November 6, 2014

John Maguire


Dear John:

This letter sets forth the agreement ("Agreement") that has been negotiated by you and Computer Sciences Corporation (the "Company") regarding

9.    The Company agrees to release you from the restrictive covenants related to competition with the Company contained in the Non Competition/Non Solicitation Agreement that you entered into with the Company on April 19, 2013 (Agreement) provided that for six (6) months after your Separation Date you will not, directly or indirectly, whether as an individual proprietor, partner, stockholder, officer, employee, consultant, director, joint venturer, investor, lender, agent, contractor  member or in any other capacity, associate with the following entities:          , Cognizent                 , without the written permission of the Company's CEO.  You further agree and acknowledge that all other provisions of the Agreement shall remain as written except that the restriction concerning the Non-Solicitation of Company employees and consultants shall be shortened to 12 months and that the restriction on the Non Solicitation of CSC clients be eliminated with the exception of the following 8 clients whose Non Solicitation restrictions will remain in effect as written in the Agreement for the shortened period of 12 months.

________

date

Very truly yours,


Donna Lesch
Executive VP and CHRO


The foregoing terms and conditions, including specifically the releases set forth above, are
hereby accepted as of the date of this letter, subject to the terms hereof.

By: _____

Date: _____11 / 13 / 14_____

# EXHIBIT 8

# EXHIBIT 8

January 19, 2015

To:      John Maguire
From:   Bill Deckelman
Subject:  Amendment to Letter Agreement, dated November 13, 2014

Dear John:

As we have discussed, this memorandum will constitute an amendment to the Letter Agreement referenced above between CSC and yourself, as follows:

1. The Letter Agreement will continue in full force and effect on the terms and conditions stated therein, except that CSC agrees that it will waive the restriction precluding you from joining Cognizant, one of the competitors listed in the Letter Agreement.

2. In addition you agree that until April 24, 2015 you will not personally be involved in sales efforts or direct sales strategy on bids/proposals in which CSC is competing.

If you are in agreement with these terms, please counter-sign below and return to me.

Computer Sciences Corporation

By: William Deckelman, EVP & General Counsel

Agreed:

John Maguire

Date: 1/20/15